# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEWS INTERNATIONAL CORPORATION, | ) ) ) |
| Plaintiff, | ) Civil Action No. 2:20-CV-89 ) |
| v. | ) ) *Electronically Filed* |
| ANTHONY A. LOMBARDI, RONALD STOVEKEN, MICHAEL ANDREWS, IMPLANT RECYCLING, LLC, and IR ENVIRONMENTAL SOLUTIONS, LLC, | ) ) ) ) ) |
| Defendants. | ) ) |

## VERIFIED COMPLAINT

Matthews International Corporation ("Matthews"), one of Pittsburgh's oldest continually operating businesses, files this action against its former employees, Anthony A. Lombardi ("Lombardi"), Ronald Stoveken ("Stoveken"), and Michael Andrews ("Andrews") (collectively, "Individual Defendants"), and their new employer, Implant Recycling LLC ("Implant") and/or IR Environmental Solutions LLC ("IR Environmental"), a direct competitor of Matthews, to stop the Individual Defendants and Implant and/or IR Environmental from misappropriating Matthews' Confidential Information and Trade Secrets (as defined below) for the benefit of Implant and/or IR Environmental in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Con. Stat. § 5301 *et seq.*, and to prevent Stoveken and Andrews from continuing to violate their post-employment contractual obligations to Matthews.

## I. INTRODUCTION

1.     This case arises from Lombardi's and Stoveken's theft of Matthews' Confidential

Information and Trade Secrets (as defined below), which, together with Andrews, they are believed to be using on behalf of their new employer, Implant and/or IR Environmental, to compete against Matthews.

2.      Lombardi was employed by Matthews for nearly 30 years, rising to prominent levels within the Company, including, most recently, the level of Senior Manager, Operations within Matthews' Environmental Solutions division ("MES"). Lombardi travelled throughout the United States and abroad servicing Matthews' clients.

3.      Lombardi was highly compensated in that role, and it gave him an intimate understanding of Matthews' business operations, including employee specialized training and know-how, and Matthews' customers, including their purchase histories, preferences, requirements, service methods, agreements, renewal periods, and other Confidential Information and Trade Secrets related to Matthews' customers.

4.      Given the length of Lombardi's employment with Matthews, he came into contact with virtually all of MES's clients over time, frequently becoming their primary point of contact and, in many instances, the "face" of Matthews to these customers.

5.      Matthews invested heavily in maintaining these customer relationships and in Lombardi, paying him a handsome salary, providing lucrative benefits and incentive plans, and reimbursing him thousands of dollars a year for travel, which was aimed at cultivating and maintaining Matthews' relationships with its customers.

6.      In the summer of 2019, Lombardi indicated his intent to "retire." And that August, Lombardi provided his final announcement that he was "retiring" from Matthews. Around that time, a high-level Matthews executive explicitly reminded Lombardi of his post-employment obligations to the company.

7.    Unbeknownst to Matthews at the time, Lombardi's so-called "retirement" had been in the works for months. Indeed, while continuing to be paid by Matthews, Lombardi had been plotting his exit with his sights clearly set on either setting up his own competing business or going to work for one of Matthews' competitors – which is exactly what he did.

8.    At the same time, Lombardi, upon information and belief, began to store files with Matthews Confidential Information and Trade Secrets on several USB storage devices, which would effectively enable him, or his new employer, to compete with Matthews on "Day 1" after his departure from Matthews.

9.    Despite requests from Matthews, Lombardi has failed to return several USB storage devices that remain in his possession and contain Matthews Confidential Information and Trade Secrets.

10.   In the weeks that followed Lombardi's "retirement," Matthews learned that Lombardi had in fact gone to work for a competitor, Implant and/or IR Environmental. He went so far as to appear at a widely-attended industry trade show, in Chicago, Illinois, on Implant and/or IR Environmental's behalf just weeks after leaving Matthews, on or about October 25, 2019.

11.   Making matters worse, Lombardi enlisted three other Matthews employees – Stoveken, Andrews, and Corey Edwards ("Edwards") – to terminate their employment with Matthews and join him working for Implant and/or IR Environmental.

12.   Matthews has since learned that Stoveken emailed 52 attachments containing Matthews information to an email account believed to be associated with his wife on his last day of employment with Matthews, while also inserting two USB storage devices into his Matthews computer on that date.

13.   Lombardi and Stoveken, working in concert with Andrews, are, upon information

and belief, using the information they have stolen for the benefit of their new employer, Implant and/IR Environmental, to unfairly compete against Matthews in violation of the DTSA and PUTSA and Pennsylvania common law.

14.     This conduct also violates the non-competition and non-solicitation obligations of Stoveken and Andrews and improperly interferes with Matthews' well-established contractual relationships with its clients and employees.

15.     In the face of such unscrupulous and unlawful conduct, theft of trade secrets and interference with employee and customer relationship, Matthews now turns to the Court to immediately enjoin this misconduct and prevent further irreparable harm to Matthews.

## II.     PARTIES

16.     Matthews is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

17.     Lombardi is an adult individual residing, upon information and belief, in New Smyrna Beach, Florida, and is a citizen of the state of Florida.

18.     Stoveken is an adult individual residing, upon information and belief, in the state of Florida.

19.     Andrews is an adult individual residing, upon information and belief, in the state of Florida.

20.     Implant is a limited liability company organized under Michigan law, with its registered agent at 35660 Beattie Drive, Sterling Heights, Michigan 48312.

21.     Implant holds itself out as an "environmental and recycling company established specifically to serve the Crematory and Cemetery industries by recycling the metallic by-products

4

of the cremation process."[1]

22.    IR Environmental is a limited liability company organized under Michigan law, with its registered agent at 121 West Long Lake Road, Suite 200, Bloomfield Hills, Michigan 48304.

23.    Upon information and belief, IR Environmental is a division or affiliate of Implant, which provides the same type of crematory services provided by Matthews.

## III.    JURISDICTION

24.    The Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1331 because the case arises, in part, under the federal DTSA, 18 U.S.C. § 1831 *et seq.* The Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 because such claims are so closely related to the DTSA claim that they are part of the same case and controversy.

25.    The Court also has subject matter jurisdiction over this civil action under 18 U.S.C. § 1331 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.

26.    The Court has personal jurisdiction over Lombardi because he has sufficient minimum contacts with this forum: Lombardi negotiated the terms of his employment with Matthews' corporate office in Pittsburgh, Pennsylvania; was paid from Pittsburgh, Pennsylvania; and regularly interacted with and was supported by multiple departments and employees located in Pittsburgh, Pennsylvania. This Court also has personal jurisdiction over Lombardi because, in the Equity Incentive Agreements he entered into with Matthews throughout his employment and by virtue of participation in Matthews' Incentive Compensation Plan, Lombardi agreed to submit

---

[1] Implant Recycling, https://www.implantrecycling.com/ (last access Jan. 10, 2020).

to the exclusive and sole jurisdiction of this Court and not to object to this Court's exercise of personal jurisdiction over him.

27.     The Court has personal jurisdiction over Stoveken because he has sufficient minimum contacts with this forum: Stoveken negotiated the terms of his employment with Matthews' Corporate Office in Pittsburgh, Pennsylvania; Stoveken was paid from Pittsburgh, Pennsylvania; and Stoveken regularly interacted with and was supported by multiple departments and employees located in Pittsburgh, Pennsylvania. In addition, in his Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement, Stoveken irrevocably agreed to submit to the personal jurisdiction of the United States District Court for the Western District of Pennsylvania in any action or proceeding arising out of or relating to his Agreement.

28.     The Court has personal jurisdiction over Andrews because he has sufficient minimum contacts with this forum: Andrews negotiated the terms of his employment with Matthews' Corporate Office in Pittsburgh, Pennsylvania; Andrews was paid from Pittsburgh, Pennsylvania; and Andrews regularly interacted with and was supported by multiple departments and employees located in Pittsburgh, Pennsylvania. In addition, in his Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement, Andrews irrevocably agreed to submit to the personal jurisdiction of the United States District Court for the Western District of Pennsylvania in any action or proceeding arising out of or relating to his Agreement.

29.     The Court has personal jurisdiction over Implant because it has the required minimum contacts with this forum: upon information and belief, Implant transacts business in Pennsylvania; holds itself out to potential customers in Pennsylvania; and, upon information and belief, either alone, or acting together with IR Environmental, actively sought to employ Stoveken and Andrews knowing that they were formerly employed by a Pennsylvania corporation,

Matthews, and entered into agreements with Matthews containing forum selection clauses that provide that the Western District of Pennsylvania is the appropriate forum, such that Implant could have expected to be haled into court here.

30.     The Court has personal jurisdiction over IR Environmental because it has the required minimum contacts with this forum: upon information and belief, IR Environmental transacts business in Pennsylvania; holds itself out to potential customers in Pennsylvania; and, upon information and belief, either alone, or acting together with Implant, actively sought to employ Stoveken and Andrews knowing that they were formerly employed by a Pennsylvania corporation, Matthews, and entered into agreements with Matthews containing forum selection clauses that provide that the Western District of Pennsylvania is the appropriate forum, such that Implant could have expected to be haled into court here.

31.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(2) because this lawsuit arises out of events in and impacting Pittsburgh, Pennsylvania, with the key witnesses and documents located in the Western District of Pennsylvania. In addition, some, or all, of the Confidential Information and Trade Secrets at issue have their situs in the Western District of Pennsylvania, where Matthews' principal place of business is located.

## IV.     FACTS

### Matthews' Business

32.     Founded in 1850, Matthews is one of Pittsburgh's oldest continually operating businesses.

33.     Through MES, Matthews' cremation and incineration business, Matthews is a designer, manufacturer and marketer of both traditional flame-based and water-based biological

cremation equipment, cremation services and supplies, environmental systems, crematory management/operations, cremation columbarium and niche parts and cremation urns for use primarily in funeral homes, cemeteries, crematories, pet crematories, animal disposers and by veterinarians in the United States, Canada, Europe, Latin America, and Australia.

34. Matthews is a global leader in cremation equipment, manufacturing leading edge cremation systems and related parts and supplies.

35. In addition to manufacturing equipment and providing installations, Matthews provides customers with an array of services, including on-call field service and technical support by phone and email, including through its M-pyre Cremation Technology system.

36. The M-pyre system features remote capabilities that allows Matthews' customers to monitor crematory activity, create performance reports, and communicate with Matthews' technical support via the internet. M-pyre is comprised of four major components: (a) state-of-the-art electronic fuel, air, and burner controls; (b) programmable logic controller; (c) the MyMpyre.com Web Server; and (d) an instant support notification system, which notifies Matthews and its customers whenever something needs attention.

37. Matthews also invests significantly in regional and nationwide recruiting and development to employ individuals of talent and develop its employees' talents and special skills in a unique field.

38. In an ongoing effort to improve its products and services, Matthews requires its employees to spend hours in the classroom and in the field learning the most advanced techniques in crematory service, repair and maintenance.

### Lombardi's Employment with Matthews and Access to Matthews' Confidential Information and Trade Secrets

39. Matthews hired Lombardi in 1991.

40.     Most recently, Lombardi held the position of Senior Manager, Operations, in Matthews Cremation Division. He was based in Apopka, Florida, and reported directly to Steve Schaal, the President – North America of Matthews Environmental Solutions.

41.     In that role, Lombardi was primarily responsible for overseeing plant operations and Matthews' technical support team, which provides hotline and startup support for Matthews' clients.

42.     Lombardi's duties included, among other things, directing and managing division manufacturing operations and engineering processes and activities; participating in developing, planning and implementing the business' global strategic plan; participating in product design initiatives, customer project planning, and equipment engineering/design; making customer and site visits, during which he would participate in and/or oversee new equipment installations, environmental emissions evaluation, and other tasks; and appearing at trade shows on behalf of Matthews.

43.     To enable Lombardi to effectively perform these duties, Matthews granted him access to information concerning past, present and prospective business contacts and customers, such as customer lists, contact information, purchase, requirements, service methods, and customers' confidential information; information relating to sales of products and services, such as pricing strategies, marketing strategies, marketing information, branding, earnings and cost information, profitability, contracts, sales information, sales methods, and sales proposals; product and distribution information, such as formulas, materials, equipment, inventory, sources of supply and material specifications, operational information, and manufacturing information; technical and operational information, such as designs, dimensions, research, ideas, know-how, processes, inventions, patents, data/information management systems, computer programs, systems and

system improvements, software and software modifications; business plans and information; internal Company information, such as the business structure, business policies and practices, operating procedures, methods of doing business, work force and personnel information, work assignments, and information related to specific capabilities, training and specialized knowledge of certain Company employees ("Confidential Information and Trade Secrets").

44.     Lombardi, like all Matthews' employees, is subject to ***Matthews Code of Business Conduct and Ethics***, which was implemented in 2004. It specifically provides, among other things that employees are:

(a) prohibited from taking for themselves personal opportunities that are discovered through the use of corporate property, information of the Company or the employee's position with the Company without consent of the Board of Directors of Company ("Corporate Opportunities" Section);

(b) prohibited from using corporate property, information of the Company, or their position with the Company for improper personal gain ("Corporate Opportunities" Section)

(c) prohibited from stealing proprietary information, possessing trade secret information that was obtained without the owner's consent or inducing such disclosures by past or present employees of other companies ("Competition and Fair Dealing" Section);

(d) required to maintain the confidentiality of confidential information entrusted to them by the Company or its customers, except when disclosure is authorized by the General Counsel or legally required (with Confidential Information including "all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed.") ("Confidentiality" Section).

45.     Lombardi's position often took him into the field, where he would regularly interact

with Matthews' customers in the United States and abroad.

46.     Having worked for Matthews for over 25 years, Lombardi interacted in some manner (either by email, phone or in person) with most of Matthews' customers, gaining a deep understanding of their purchase histories, preferences, requirements, service methods, and other Confidential Information and Trade Secrets related to Matthews' customers.

47.     Indeed, through his interactions with Matthews' customers, Lombardi effectively became the "face" of Matthews for these customers.

48.     When in the field, Lombardi also performed preventative maintenance inspections for Matthews' clients and startup and commissioning of new equipment.

49.     If a job required additional assistance, Lombardi would often enlist Andrews and Edwards to travel with him on site visits to meet the client's needs.

50.     In addition, as a trusted senior leader of the business, Lombardi was responsible for helping develop and lead Matthews' strategic planning sessions, executive staff meetings, and global organization construct.

51.     Most recently, Lombardi was present at Matthews' 2020 Strategic Planning session, which occurred in April 2019. He also participated in several global organization discussions, the most recent of which occurred in August 2019, after Lombardi had already announced his "retirement" and provided assurances to Matthews' management that he was not going to continue to work in the same line of business.

52.     In exchange for performing these duties and accepting the responsibilities entrusted to him by Matthews, Lombardi was well compensated. He earned in excess of $125,000 per year when his employment with Matthews ended and received many other additional financial benefits, such as participation in Matthews' Equity Incentive Plan and Incentive Compensation Plan.

53.     Lombardi had access to MES's valuable Confidential Information and Trade Secrets, including, but not limited to, information related to: (a) the M-pyre system (the proprietary control system for interfacing with customers' equipment, which is described above); (b) customer information, including their purchase histories, preferences, requirements, service methods, agreements, renewal periods, and MES's complete customer list; (c) MES's research and development efforts, including product drawings and specifications for MES' equipment and equipment advancements as well as its marketing materials for such products, equipment and services; (d) MES's material costs and pricing information; (e) MES's technician training and development material, including operator certification material and Matthews' "Tech Bible;" and (f) MES's know-how, processes and procedures, including the practical technician and administration forms (the practical operations documents developed for MES's business and legal needs).

54.     In addition to providing Lombardi with access to its Confidential Information and Trade Secrets, Matthews invested heavily in Lombardi throughout his 28 years of employment so Lombardi could, in turn, invest in Matthews' customers.

55.     For example, Matthews funded Lombardi's participation in industry trade shows and paid Lombardi thousands of dollars per year in reimbursements for travel and related expenses.

### Stoveken's Employment with Matthews and Access to Matthews' Confidential Information and Trade Secrets

56.     Stoveken became employed by Matthews in 1996.

57.     In September 2019, Stoveken was promoted to Manager Technical Support.

58.     In that position, Stoveken worked intimately with Matthews' customers, as he was responsible for, among other things, addressing customer complaints and issues and maintaining a consistent flow of communication with customers until issues were resolved; scheduling service

calls to fulfill customer issues; performing follow-up calls with customers; maintaining a customer specification database and preparing documents for use during customer inquiries; and investigating and resolving customer complaints.

59.     In connection with Stoveken's promotion to Manager Technical Support, Stoveken entered into a Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement with Matthews ("Stoveken's Agreement"), a copy of which is attached as **Exhibit A**.

60.     Without agreeing to those post-employment obligations, Stoveken would not have received the promotion or attendant increase in compensation and responsibilities.

61.     In Stoveken's Agreement, Stoveken acknowledged that in the execution of his duties and responsibilities for Matthews, Stoveken would have access to Matthews' Confidential Information and Trade Secrets and existing and prospective customer relationships.

62.     Stoveken in turn agreed that all such Confidential Information and Trade Secrets "is the sole and exclusive property of [Matthews] and the use, misappropriation or disclosure of any or all Confidential Information other than in the course of [Stoveken's] employment with [Matthews], or as provided for in this Agreement, would constitute a breach of trust and would cause irreparable harm to [Matthews], its good will, and its competitive position." Ex. A at ¶ 1(a).

63.     Stoveken also agreed "that, at all times during and after [his] employment," he would "not use or cause to be used, directly or indirectly, for [his] own benefit or the benefit of any third party, or disclose or reproduce or make available to any third party in any manner, directly or indirectly, any Confidential Information or any other knowledge or information, except that which is public knowledge, of or relating to [Matthews'] business, without the express prior written consent of the CEO & President of Matthews and the President of MES." *Id.* ¶ 1(b).

64.     Consistent with that obligation, Stoveken agreed "to return to [Matthews], either

before or immediately upon the termination of [his] employment, all Company-issued property . . . ." *Id.* ¶ 1(c).

65.     In the event of a breach of these obligations, Stoveken agreed that "injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate[.]" *Id.* ¶ 1(d).

66.     In addition to his obligations regarding Matthews' Confidential Information, Stoveken agreed to certain post-employment non-competition and non-solicitation obligations.

67.     With respect to non-competition, Stoveken agreed that his "Manager Technical Support position is regional and national in scope and that [Matthews'] customer base is national and international in scope" and also that Matthews invests in "regional and nationwide recruiting and development to employ and promote individuals of [his] talent; the promotion of good-will among [him] and customers; and the development of [his] talent and special skill in a unique field (including Confidential Information)." *Id.* ¶ 2(b).

68.     Accordingly, Stoveken agreed:

> that for a period of two (2) years after the termination of [his] employment and within the Territory defined in this Paragraph 2(b), Employee will not, directly or indirectly, work for, sell products or services to, consult with, or have any interest in any business, firm, person, partnership or corporation (whether as an agent, employee, officer, director, security holder, creditor, consultant, or otherwise) which either (i) directly, or through a related entity, has purchased products or services from MES within the two (2) year period preceding Employee's termination of employment or (ii) engages in a business competitive with MES. For the purposes of this Paragraph 2(b), the "Territory" means: (i) The United States, excluding California and Oklahoma; (ii) Any State east of the Mississippi River; (iii) Any State east of the Mississippi River and south of Kentucky or Virginia; and (iv) the State of Florida.

*Id.*

69.     With respect to non-solicitation, Stoveken agreed as follows:

c.      <u>Customer Non-Solicitation</u>.  Employee agrees that, for a period of two (2)

years after the termination of Employee's employment, Employee will not have direct or indirect contact with any of MES's then-current customers, with any of MES's former customers, or with any prospective customers to which the Company has submitted written bids or written proposals or from which MES has actively solicited business, where that contact has either of the following purposes (which need not be the sole or primary purpose): (1) selling or otherwise providing any type of product or service that MES is in the business of selling or otherwise providing, or (2) encouraging the current, former, or prospective customer to cease doing business with MES, or to curtail its business with MES, or not to commence doing business with MES.

d.　　Employee Non-Solicitation. Employee agrees that, for a period of two (2) years after the termination of Employee's employment, Employee will not, directly or indirectly, induce or attempt to induce any of the Company's employees to leave their employment with the Company or to modify their relationship with the Company and will not hire any of the Company's employees, whether hired by Employee or by Employee on behalf of any other person or entity.

*Id.* ¶ 2(c)-(d).

### *Andrews' Employment with Matthews and Access to Matthews' Confidential Information and Trade Secrets*

70.　　Andrews became employed by Matthews in 2009.

71.　　In August 2014, Andrews was promoted to Service Technician in Matthews' Cremation Division.

72.　　In that position, Andrews was responsible for, among other things, servicing, repairing, rebuilding, troubleshooting or upgrading, or any other tasks required to complete any field job involving Matthews (or others companies') cremation equipment and for mastering, and helping others in the fabrication, assembly and manufacturing of cremation equipment, accessories, and components in the shop.

73.　　In connection with his promotion to Service Technician, Andrews entered into Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement with Matthews ("Andrews' Agreement"), a copy of which is attached as **Exhibit B**.

74.　　In Andrews' Agreement, Andrews acknowledged that in the execution of his duties

and responsibilities for Matthews, Andrews would have access to Matthews' Confidential Information. *Id.* ¶ 1(a).

75.     Andrews in turn agreed that "the Confidential Information is the sole and exclusive property of Matthews." *Id.*

76.     Andrews also agreed that "at all times during and after [Andrews'] employment with Matthews, [he] will not use or cause to be used, directly or indirectly, for [his] own benefit or for the benefit of any third party, or disclose or reproduce or make available to any third party in any manner, directly or indirectly, any information of a confidential or proprietary nature, trade secrets or any other knowledge or information, except that which is public knowledge, of or relating to Matthews' business[.]" *Id.* ¶ 1(c).

77.     Consistent with that obligation, Andrews agreed "to return to [Matthews], either before or immediately upon the termination of [his] employment, . . . any and all written information, materials and equipment which constitute, contain or relate in any way to proprietary or Confidential Information or trade secrets of Matthews[.]" *Id.* ¶ 1(d).

78.     In the event of a breach of these obligations, Andrews agreed that "injunctive relief, in addition to any other remedies provided by law or in equity, shall be necessary and appropriate[.]" *Id.* ¶ 1(b).

79.     In addition to his obligations regarding Matthews' Confidential Information, Andrews agreed to certain post-employment non-competition and non-solicitation obligations.

80.     With respect to non-competition, Andrews agreed "that Matthews' Cremation Division is international in scope and that Matthews solicits business from and does business with customers located throughout the United States, Canada, Mexico, Europe and Australia, including servicing customers from all of these locations through its customer service department and inside

sales team." *Id.* ¶ 2(b).

81.     Accordingly, Andrews agreed:

that for a period of two (2) years after the termination of [his] employment, [he] will not, directly or indirectly, engage in, consult with, or have any interest in any business, firm, person, partnership or corporation, whether as employee, officer, director, agent, security holder, creditor, consultant, or otherwise, which engages in a business competitive with the Cremation Division of Matthews.

*Id.*

82.     With respect to non-solicitation, Andrews agreed as follows:

Customer Non-Solicitation. [Andrews] agrees that, for a period of two (2) years after the termination of [his] employment, [he] will not have direct or indirect contact with any Matthews Cremation Division then-current customers, with any of the Matthews Cremation Division customers, or with any prospective customers to which Matthews Cremation Division has submitted bids or proposals or from which Matthews Cremation Division has actively solicited business, where that contact has either of the following purposes (which need not be the sole or primary purpose): (1) selling or otherwise providing any type of product or service that Matthews Cremation Division is in the business of selling or otherwise providing, or (2) encouraging the current, former, or prospective customer to cease doing business with Matthews Cremation Division or to curtail its business with Matthews Cremation Division not to commence doing business with Matthews Cremation Division.

Employee Non-Solicitation. [Andrews] agrees that, for a period of two (2) years after the termination of [his] employment, [he] will not, directly or indirectly, induce or attempt to induce any of Matthews' employees to leave their employment with Matthews or to modify their relationship with Matthews and will not hire any Matthews employee, whether hired by Employee or by Employee on behalf of any other person or entity.

*Id.* ¶ 2(d).

### Lombardi's Plot to Establish a Competing Business and So-Called "Retirement" from Matthews

83.     Though unbeknownst to Matthews at the time, Lombardi began plotting his exit from Matthews as early as November 2018.

84.     His goal was clear: he wanted to establish or go to work for a competing business.

85.     For example, between November 2018 and June 2019, while using his Matthews-issued laptop, Lombardi performed searches such as "executive jobs in florida," "business plan," and "small business ideas." Affidavit of Brett Creasy, attached as **Exhibit C** ("Creasy Aff.") ¶ 7.

86.     On February 4, 2019, while still employed by Matthews, Lombardi established a company called Thermal Equipment LLC.

87.     On June 15, 2019, Lombardi's internet search for "small business ideas" led him to a website article titled "Best Bank for Small Business in 2019? These 11 Top the List." Creasy Aff. ¶ 7.

88.     Beginning just four days later, Lombardi began emailing Ann York, Matthews Senior Human Resource Business Partner, about his "retirement" plans. *Id.*

89.     In an email on June 19, 2019, Lombardi asked York questions about his health insurance options post-"retirement," and he also requested a "copy of [his] company file including any non-compete [he] may have signed over the years," while noting that he had "been in the death care business all [his] life and if [he] wanted to work for a cemetery, funeral home or crematory [he] need[s] to be able to review any non-compete restrictions."

90.     Notably, Lombardi requested that the email be kept "confidential in matter" purportedly because his "direct manager may have concerns about [him] considering retirement[.]"

91.     On August 1, 2019, Lombardi notified York that his last day of employment would be September 6, 2019.

92.     A few weeks later, Lombardi emailed Matthews Executive Vice President of Strategy, Brian Dunn, explaining his "retirement" plans:

> Brian,
> I have worked very hard at perfecting my skills over the years. I came to Matthews with more experience than most employees at Matthews Environmental. I assisted in teaching and training most of the hourly employees as well as all other positions in the company. I feel it is time for me to test the marketplace because my income

and advancement opportunities seem to be exhausted here.
The team atmosphere you and the division inspire to have I typically do not fit into
at this point of my life. I have been so use to being the answers to questions rather
being a part of a community answer that I feel this would again be a obsticle to the
divisions success moving forward.
My work ethic, experience, loyalty and dedication are attributes I feel would peak
the interest to many potential employers if I feel I need to go back to work.

93. On August 29, 2019, Lombardi provided Matthews with formal notice that he was "retiring."

94. In an email to Dunn, Lombardi claimed that "a change [was] needed and that [his and his wife's] stress level needs improvement."

95. In response, Dunn expressed regret with Lombardi's decision but wished him luck.

96. Dunn also reminded Lombardi of the post-employment obligations to Matthews in Lombardi's Equity Incentive Agreements.

97. Lombardi's last day of employment with Matthews was September 6, 2019.

98. In the lead-up to his resignation, Lombardi solicited Stoveken, Andrews and Edwards to quit their employment with Matthews and go to work for Implant and/or IR Environmental.

99. Stoveken resigned his employment with Matthews at Lombardi's behest on or about November 27, 2019. Notably, when asked by his supervisor about where he was going to work, Stoveken refused to answer.

100. Andrews resigned his employment with Matthews at Lombardi's behest on or about November 29, 2019.

101. Edwards resigned his employment with Matthews at Lombardi's behest on or about November 29, 2019. Around that time, Edwards advised another Matthews employee that he was going to work for Lombardi.

102. On December 2, 2019, Stoveken, Andrews, and Edwards flew to Detroit, Michigan,

to meet with their new employer, Implant and/or IR Environmental.

### *Lombardi's and Stoveken's Theft of Matthews' Confidential Information and Trade Secrets*

103.    Soon after Lombardi's employment with Matthews ended, it became apparent that his announced "retirement" was all a ruse.

104.    Not only that, but as Lombardi was also plotting his exit from Matthews and searching for new jobs, he was also surreptitiously storing away Matthews Confidential Information and Trade Secrets for use in establishing and/or going to work for a competing business in violation of *Matthews Code of Business Conduct and Ethics* as well as provisions of his Equity Incentive Agreements and Incentive Compensation Plan, which are described in the related Civil Action filed by Matthews against Lombardi at Civil Action No. 2:19-cv-1611.

105.    After Lombardi terminated his employment, Matthews retained bit-x-bit, LLC ("bit-x-bit") to forensically examine Lombardi's Dell Latitude laptop, service tag "55413G2" ("the Lombardi laptop") and Samsung Galaxy S6 cell phone, serial number "RF8J108AKGN" ("the Lombardi cell phone"), both of which Lombardi used for his work at Matthews. *See* Creasy Aff. ¶ 5.

106.    The forensic examination of the Lombardi laptop identified the unique password protected user account of "tlombardi" for Lombardi. *See id.* ¶ 6.

107.    The forensic examination identified 21 external USB storage devices that Lombardi used over the course of his use of the Lombardi laptop. *See id.* ¶ 8.

108.    At least two of the USB devices were used on June 15, 2019, the same day Lombardi was performing the searches for a small business bank, and ten of the USB storage devices were used on July 25, 2019. *See id.*

109.    One USB storage device, which had not been used in nine months, was plugged in

on August 29, 2019, just a few days before Lombardi's last day with Matthews. *See id.*

110. Further examination of the use of the USB storage devices found that Matthews' files and information, including Confidential Information and Trade Secrets, was and likely still is stored on those devices. *See id.* ¶ 9. Lombardi has refused to turn over those USB devices to Matthews.

111. The USB devices appear to contain files that fall within at least five categories:

- Files related to the M-pyre control system;

- Files related to customer information, including the MES's complete customer list;

- Files containing product drawings, specifications, BOMs, and marketing material;

- Files containing material costs and pricing information; and

- Files containing technician training and development material (including operator certification material).

112. Examples of the confidential Matthews information that Lombardi was opening from an external USB storage drive on July 25, 2019 include: (a) "Price Sheet 2.0.xlsx," (b) "[Customer] locations with volumes.xlsx;" (c) "FY 2013 Apopka 4401 Sales 10-1-12 thru 9-30-13 – [Customer].xlsx;" (d) "List of drawings still needed..xlsx;" (e) "Summary of Material Modifications eff 1.1.17.pdf;"  (f) "Power Pak II.pdf;" (g) "Rebuild kits for roof and floor forms.pdf;" and (h) "service pricing fy14.1.xlsx." *See id.*

113. Additional examples of Matthews' files and information that were copied to USB storage devices include a folder named after a customer, and its subfolders "2018" and "SERVICE REPORT-101048947," which were created on one of the external USB storage devices on June 27, 2019. Likewise, the folders "South Carolina – SC," and "Alabama – AL" were created on an external USB storage device on June 26, 2019. *See id.* ¶ 10.

114. Lombardi had no business-related reason to access any of these files during this

time period, as the files he was accessing do not correspond to field visits he was making with Matthews customers during this time.

115.    Armed with the information in these files, Lombardi had all of the information he needs to establish his own competing business or assist Implant and/or IR Environmental in competing with Matthews in the crematory services sector.

116.    Instead, upon information and belief, Lombardi was accessing information related to Matthews customers that he intended to target on behalf of his new business ventures and/or Implant or IR Environmental.

117.    Matthews has requested that Lombardi return all USB storage devices in his possession that could contain Matthews Confidential Information and Trade Secrets.

118.    To date, however, Lombardi has refused to turn over any of the USB storage devices that he plugged into the Lombardi laptop.

119.    The forensic examination of the Lombardi laptop also found that the standard folders of "Desktop," "Documents" and "Downloads" of Lombardi's user account are empty, notwithstanding a few typical system or non-user generated types of files. This is despite the fact that Lombardi regularly accessed documents from those locations up until as recently as August 30, 2019. The Lombardi laptop was searched for those missing documents and they were not found among any of the active files on the Lombardi laptop with the exception of nine documents that were found within application directories that are typically unknown to the average user. This means, at a minimum, that the documents were deleted, but it also raises the likelihood that they were moved to external storage. Creasy Aff. ¶ 11.

120.    In addition, the Samsung phone contained records after September 4, 2019, which indicate that Lombardi was in communication with Brad Wasserman ("Wasserman"). Wasserman

is a "managing member" according to Implant Recycling's website. *Id.* ¶ 12.

121. In addition to the analysis of Lombardi's Matthews-issued devices, bit-x-bit examined Stoveken's Matthews-issued devices. *Id.* ¶ 13.

122. On December 20, 2019, the Dell Latitude E5550 laptop, service tag "G0T3762" ("the Stoveken laptop"), which was used by Stoveken for his work at Matthews, was forensically imaged and collected, thereby preserving all available active and deleted data on the device. In addition, a Samsung Galaxy S8 cell phone, IMEI 359031085632661 ("the Stoveken cell phone"), which Stoveken used for his work at Matthews was also supplied to bit-x-bit. *Id.* ¶ 14.

123. The forensic analysis of the Stoveken laptop and Stoveken cell phone are ongoing; however, the analysis has thus far revealed that Stoveken is in possession of filings containing Matthews Confidential Information and Trade Secrets. *Id.* ¶ 16.

124. The forensic analysis of the Stoveken laptop found that on November 27, 2019, Stoveken sent an email from his Matthews account to what appears to be his wife's personal email account "salgal12@hotmail.com," which contained 52 attachments. Examples of the attachment names include: "M-Pyre 2 client password list.pdf" and "M-Pyre 2 Sales messaging, maintenance and Inventory.pdf." *Id.* ¶ 16. The "M-Pyre 2 client password list.pdf" contains client login information and passwords. The "M-Pyre 2 Sales messaging, maintenance and Inventory.pdf" document is a how-to guide for use by Matthews sale representatives. In addition to these files, the email included files containing diagrams and schematics related to proprietary and technical cremation equipment manufactured and owned by Matthews. *Id.* ¶ 17.

125. The forensic analysis of the internet history on the Stoveken laptop found that Stoveken was searching for and visiting the Implant Recycling website beginning on October 24, 2019. *Id.* ¶ 17.

126.    The forensic analysis of the Stoveken laptop revealed that 24 USB storage devices have been plugged into the laptop, with two of those USB storage devices being used on November 27, 2019, Stoveken's last day with Matthews. An additional USB storage was plugged in on November 9, 2019. Prior to the November use of USB devices, a USB had not been plugged into the Stoveken laptop since June 3, 2019. It is thus far unclear what purpose there was for Stoveken to plug the USB storage devices into the Stoveken laptop just prior to his departure; however, the risk to Matthews is that he may have copied Matthews files to those USB storage devices and doing so would not have left evidence on the Stoveken laptop of what specific files that may have been. *Id.* ¶ 19.

### *Lombardi's Solicitation of Matthews' Customers and Employees*

127.    Since his so-called "retirement," Lombardi has called on Matthews' customers on behalf of Implant and/or IR Environmental.

128.    Moreover, on October 25, 2019, several Matthews' executives witnessed Lombardi working at a booth sponsored by Implant and/or IR Environmental at the National Funeral Directors' Association ("NFDA") trade show.

129.    Upon information and belief, Lombardi was in the booth at the NFDA trade show working on behalf of Implant and/or IR Environmental and soliciting customers and/or prospective customers of Matthews.

130.    Later, Lombardi confirmed to a Matthews' customer that he was working on behalf of Implant and/or IR Environmental.

131.    Upon learning of Lombardi's presence at the NFDA trade show, Matthews sent Lombardi a letter advising him of his post-employment obligations to Matthews.

132.    In an email responding to the letter, Lombardi stated "I presently am not employed

by Implant Recycling" – which unbeknownst to Matthews was an intentionally careful, but less than forthcoming, distinction between Implant and IR Environmental, the latter of which Wasserman subsequently confirmed as Lombardi's actual employer.

133.    Lombardi also claimed that he was "not soliciting Matthews clients *directly*" – while making no mention whether he was doing so *indirectly* or whether he had gone to work for Implant and/or IR Environmental for the purpose of competing against Matthews.

### Implant and/or IR Environmental Is Well Aware of Matthews' Confidential Information, Restrictive Covenants and Investments in Its Employees

134.    Over the past several years, several former Matthews employees have gone to work for Implant and/or IR Environmental.

135.    Former Matthews employee Guy Esposito ("Esposito") serves as Vice President of Implant.

136.    Former Matthews employee John Mitchell ("Mitchell") serves as Vice President of IR Environmental.

137.    In late 2018, two more former Matthews employees who had continuing post-employment obligations to Matthews, including covenants not to compete, went to work for Implant.

138.    At that time, Matthews, through counsel, sent a letter to Implant, advising Implant of its former employees' obligations not to compete and other continuing obligations to Matthews.

139.    In response, Implant's Manager Director, Wasserman, provided assurances that Implant did not intend to interfere with Matthews' contractual relationships with its former employees.

140.    Based on Matthews' previous correspondence, Implant and/or IR Environmental is aware of the types of post-employment restrictions that Matthews requires of its employees, as

well as the value that Matthews places on its Confidential Information and Trade Secrets and lengths to which Matthews goes to protect its Confidential Information and Trade Secrets.

141.    Implant and/or IR Environmental, by continuing to hire former Matthews' employees, is expanding its crematory services business based on the Confidential Information and Trade Secrets, customer relationships, and employee relationships that Matthews has worked to develop and create – such unfair competition and tortious interference must be stopped.

### *Matthews Is Entitled to Injunctive Relief*

142.    Matthews is likely to succeed on the merits of its claims as further described below, based on facts including, but not limited to: (a) Lombardi's and Stoveken's taking a large number of confidential documents, including on USB devices that contain MES'd Confidential Information and Trade Secrets, (b) Lombardi and Stoveken, together with Andrews, upon information and belief, use of MES's Confidential Information and Trade Secrets for the benefit of their new employer, Implant Recycling and/or IR Environmental, (c) Lombardi (as set forth in the separate, related Civil Action No. 2:19-cv-1611) along with Stoveken and Andrews are violating their post-employment contractual agreements with Matthews through their current work for Implant Recycling and/or IR Environmental, (c) all defendants interfered with Matthews' employment relationship with Edwards and are actively working to interfere with Matthews' customers relationships through their unfair competition with Matthews and use of its Confidential Information and Trade Secrets.

143.    Matthews' customer relationships, goodwill, market share, business opportunities, competitive advance, and the security of its Confidential Information and Trade Secrets will be immediately and irreparably harmed if injunctive relief is not granted.

144.    Matthews will suffer far greater harm if injunctive relief is not granted than the

Individual Defendant, Implant, or IR Environmental will experience if injunctive relief is granted.

145.    Granting injunctive relief will serve the public interest.

**COUNT I**
**Violation of the DTSA**
**(All Defendants)**

146.    Matthews incorporates by reference Paragraphs 1 through 145 of the Verified Complaint as if set forth fully herein.

147.    In the course of their employment, Matthews granted the Individual Defendants access to and use of Confidential Information and Trade Secrets, as defined above.

148.    Matthews is the owner of such Confidential Information and Trade Secrets.

149.    The Confidential Information and Trade Secrets to which the Individual Defendants had access is related to Matthews' products or services that are used in or intended for use in interstate or foreign commerce.

150.    Matthews has spent significant time and money developing its Confidential Information and Trade Secrets.

151.    Matthews' Confidential Information and Trade Secrets are protected, kept confidential, and not publicly disclosed.

152.    Matthews has, at all times, taken reasonable measures to protect its Confidential Information and Trade Secrets, including, but not limited to, restricting electronic and physical access to such information and requiring its employees to be subject to a Code of Conduct and as appropriate, to execute various agreements and be subject to various plans, which also require confidentiality, prior to having access to such information and receiving the opportunity for certain benefits from Matthews.

153.    Matthews' Confidential Information and Trade Secrets derive independent

economic value, actual or potential, from being not generally known to, and not being readily ascertained through proper means by, another person who can obtain economic value from the disclosure or use of that information.

154.     Disclosure and unauthorized use of this type of information undermines Matthews' competitive position in the industry.

155.     Lombardi misappropriated Matthews' Confidential Information and Trade Secrets by storing such information on USB storage devices and failing to return such information upon terminating his employment with Matthews.

156.     The Confidential Information and Trade Secrets stored on the USB storage devices, which Lombardi has failed to return to Matthews, includes, but is not limited to, the following: files related to the M-pyre control system; files related to customer information, including Matthews' complete customer list; files containing product drawings, specifications, BOMs, and marketing material; files containing material costs and pricing information; and files containing technician training and development material (including operator certification material) (all as defined more specifically in Paragraphs 107-114 above).

157.     Lombardi is still in possession of, or has used, disclosed, or relied upon Matthews' Confidential Information and Trade Secrets, which is stored on the USB devices, to benefit himself and Implant and/or IR Environmental and to compete against Matthews.

158.     Stoveken misappropriated Matthews' Confidential Information and Trade Secrets by, among other things, sending emails with files containing such information from his Matthews account to a personal account on his last day of employment with Matthews and, upon information and belief, storing such information on USB storage devices and failing to return such information upon terminating his employment with Matthews.

159.     Stoveken is still in possession of, or has used, disclosed, or relied upon Matthews' Confidential Information and Trade Secrets, he emailed to himself and, upon information and belief, stored on USB devices, to benefit himself and Implant and/or IR Environmental and to compete against Matthews.

160.     Upon information and belief, Andrews is unlawfully using Matthews' Confidential Information and Trade Secrets within their personal knowledge gained by virtue of their employment with Matthews on behalf of Implant and/or IR Environmental.

161.     Upon information and belief, the Individual Defendants disclosed Matthews' Confidential Information and Trade Secrets to Implant and/or IR Environmental and have been used, and are continuing to be used, by the Individual Defendants and Implant and/or IR Environmental in furtherance of Implant's and/or IR Environmental's interests.

162.     Upon information and belief, Implant and/or IR Environmental acquired Matthews' Confidential Information and Trade Secrets by virtue of its employment of the Individual Defendants and their use of such information for the benefit of Implant and/or IR Environmental.

163.     Lombardi's conduct is knowing, willful, intentional, malicious, unprivileged, and in bad faith, and caused – and will continue to cause – immediate and irreparable harm to Matthews, as well as causing it to suffer compensatory damages.

164.     Matthews is entitled to injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees and/or other appropriate relief under Section 1836 of the DTSA.

## COUNT II
### Violation of the PUTSA
### (All Defendants)

165.     Matthews incorporates by reference Paragraphs 1 through 164 of the Verified

Complaint as if set forth in full herein.

166. The Individual Defendants are "person[s]" as defined by the PUTSA.

167. In the course of his employment, Matthews afforded the Individual Defendants access to and use of its Confidential Information and Trade Secrets, as defined above.

168. Matthews has spent significant time and money developing such Confidential Information and Trade Secrets.

169. Matthews' Confidential Information and Trade Secrets are protected, kept confidential, and are not publicly disclosed.

170. Matthews' Confidential Information and Trade Secrets are valuable and would be harmful to Matthews in the hands of its competitors.

171. By virtue of their employment with Matthews, the Individual Defendants were obligated to maintain the confidentiality of Matthews' Confidential Information and Trade Secrets, as well as not to use them for their personal benefit or the benefit of Implant and/or IR Environmental.

172. Lombardi misappropriated Matthews' Confidential Information and Trade Secrets by storing such information on USB storage devices and failing to return such information upon terminating his employment with Matthews.

173. The Confidential Information and Trade Secrets stored on the USB storage devices, which Lombardi has failed to return to Matthews, includes, but is not limited to, the following: files related to the M-pyre control system; files related to customer information, including Matthews' complete customer list; files containing product drawings, specifications, BOMs, and marketing material; files containing material costs and pricing information; and files containing technician training and development material (including operator certification material) (all as

defined more specifically in Paragraphs 107-114 above).

174.   Lombardi is still in possession of, or has used, disclosed, or relied upon Matthews' Confidential Information and Trade Secrets, which is stored on the USB devices, to benefit himself and Implant and/or IR Environmental and to compete against Matthews.

175.   Stoveken misappropriated Matthews' Confidential Information and Trade Secrets by, among other things, sending emails with files containing such information from his Matthews account to a personal account on his last day of employment with Matthews and, upon information and belief, storing such information on USB storage devices and failing to return such information upon terminating his employment with Matthews.

176.   Stoveken is still in possession of, or has used, disclosed, or relied upon Matthews' Confidential Information and Trade Secrets, he emailed to himself and, upon information and belief, stored on USB devices, to benefit himself and Implant and/or IR Environmental and to compete against Matthews.

177.   Upon information and belief, Andrews is unlawfully using Matthews' Confidential Information Matthews' Confidential Information and Trade Secrets within their personal knowledge gained by virtue of their employment with Matthews on behalf of Implant and/or IR Environmental.

178.   Upon information and belief, the Individual Defendants disclosed Matthews' Confidential Information and Trade Secrets to Implant and/or IR Environmental and have used, and are continuing to be used, by the Individual Defendants and Implant and/or IR Environmental in furtherance of Implant's and/or IR Environmental' s interests.

179.   Alternatively, the Individual Defendants will inevitably disclose and continue to disclose and use Matthew's Confidential Information and Trade Secrets to compete directly with

31

Matthews on behalf of Implant and/or IR Environmental.

180. Upon information and belief, Implant and/or IR Environmental acquired Matthews' Confidential Information and Trade Secrets by virtue of its employment of the Individual Defendants and their use of such information for the benefit of Implant and/or IR Environmental.

181. As a direct and proximate result of the misappropriation of Matthews' Confidential Information, including trade secrets, Matthews has suffered and will continue to suffer substantial damages, including but not limited to the loss of goodwill and profits.

182. Defendants' conduct is knowing, willful, intentional, malicious, unprivileged, and in bad faith, and caused – and will continue to cause – immediate and irreparable harm to Matthews, as well as causing it to suffer compensatory damages.

183. Matthews is entitled to injunctive relief, double damages and affirmative relief to ensure protection of its trade secrets, an award of reasonable attorneys' fees, exemplary damages and/or other appropriate relief under Sections 5303-5305 of the PUTSA.

### COUNT III
### Breach of Contract
### (Stoveken and Andrews)

184. Matthews incorporates by reference Paragraphs 1 through 183 of the Verified Complaint as if set forth in full herein.

185. Stoveken's Agreement is a valid, enforceable contract supported by adequate consideration, which Stoveken voluntarily and knowingly entered into.

186. Andrews' Agreement is a valid, enforceable contract supported by adequate consideration, which Stoveken voluntarily and knowingly entered into.

187. The restrictions contained in Stoveken's Agreement and Andrews' Agreement are reasonably limited to protect Matthews' legitimate business interests in protecting against

interference with its customer relationship, goodwill and Confidential Information and Trade Secrets in preserving a period of time in which Matthews will be able to regroup and replace its employees should they decide to terminate their employment with Matthews.

188.    By the conduct described above – specifically, going to work for Implant and/or IR Environmental and competing against Matthews and soliciting each other and Edwards to go to work for Implant and/or IR Environmental – Stoveken and Andrews violated their Agreements with Matthews.

189.    This knowing, willful and intentional breach of the Agreements has caused, and will continue to cause, immediate and irreparable harm to Matthews, in addition to causing it to suffer other compensatory damages.

**COUNT IV**
**Conversion**
**(Lombardi and Stoveken)**

190.    Matthews incorporates by reference Paragraphs 1 through 189 of the Verified Complaint as if set forth in full herein.

191.    Matthews owned, had legal possession of, and was entitled to possession of its Confidential Information and Trade Secrets (as defined above).

192.    Lombardi and Stoveken assumed and exercised dominion and control over Matthews Confidential Information and Trade Secrets in an unlawful manner by retaining such Confidential Information and Trade Secrets in their possession after resigning their employment with Matthews, to the exclusion of and inconsistent with Matthews' rights.

193.    In Lombardi's case, he retained Matthews Confidential Information and Trade Secrets on USB devices.

194.    In Stoveken's case, he emailed files containing Matthews Confidential Information

33

and Trade Secrets from his Matthews email account to a personal account.

195.    Matthews demanded the return of its Confidential Information and Trade Secrets but, to date, Lombardi and Stoveken have failed to return Matthews Confidential Information and Trade Secrets.

**COUNT V**
**Tortious Interference with Contractual Relationships**
**(All Defendants)**

196.    Matthews incorporates by reference Paragraphs 1 through 195 of the Verified Complaint as if set forth in full herein.

197.    Matthews is a party to valid and enforceable Agreements with Stoveken and Andrews and also had an employment relationship with Edwards.

198.    In addition, Matthews has contractual relationships with clients, which are economically valuable to Matthews and of which the Individual Defendants and Implant and/or IR Environmental was aware.

199.    Lombardi was aware of Stoveken's and Andrews' post-employment obligations to Matthews, by virtue of his long-term employment with Matthews and familiarity with the post-employment obligations that Matthews generally imposes on its employees. Lombardi was further aware that Matthews employed Edwards.

200.    Implant and/or IR Environmental was aware of Stoveken's and Andrews' post-employment obligations to Matthews since before they hired Stoveken and Andrews, by virtue of Matthews' prior communications with Implant about the post-employment obligations of its employees.    Implant and/or IR Environmental were further aware that Matthews employed Edwards.

201.    Lombardi, Implant, and/or IR Environmental intentionally interfered with

Matthews' Agreements with Stoveken and Andrews by soliciting and hiring them to perform work on behalf of Implant and/or IR Environmental providing competing services to those provided by Matthews. Lombardi, Implant, and/or IR Environmental also intentionally interfered with Matthews' employment relationship with Edwards by soliciting and hiring him to perform work on behalf of Implant and/or IR Environmental.

202. On information and belief, the Individual Defendants and Implant and/or IR Environmental have or will seek to interfere with other contractual relationships between Matthews and its clients and employees unless injunctive relief is granted.

203. Defendants' conduct is not privileged.

204. Defendants acted knowingly, willfully, intentionally, maliciously, and in bad faith and have caused, and will continue to cause, immediate and irreparable harm to Matthews, in addition to causing it to suffer other compensatory damages.

### COUNT VI
### Breach of Duty of Loyalty
### (Lombardi)

205. Matthews incorporates by reference Paragraphs 1 through 204 of the Verified Complaint as if set forth in full herein.

206. An employee has a duty of loyalty to provide services to his employer in accordance with his employment contract. *See B.G. Balmer & Co. v. Frank Crystal & Co.*, 2016 Pa. Super. LEXIS 516 (Pa. Super. Ct. Sept. 9, 2016); *Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa. Super. Ct. 2003).

207. Further, an employee has a duty to "act with the utmost good faith in the furtherance and advancement of the interests of his" employer. *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962).

208. An employee's duty of loyalty includes "a duty not to act or to agree to act during

the period of his [employment] for persons whose interests conflict with those of the [employer] in matters in which the [employee] is employed." *Restatement (Second) of Agency*, § 394.

209. "[A]n employee who expects to terminate his employment. . . may not. . . before the termination of his employment, solicit customers for [a] rival business, nor may he do other similar acts in direct competition with the employer's business." *Colonell v. Goodman*, 78 F. Supp. 845, 847 (E.D. Pa. 1948) (citing *Restatement of Agency*, § 393(e)); *see also Restatement (Second) of Agency*, § 393 ("Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."); *Restatement (Second) of Agency*, § 393, comment (e) (agent "is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business").

210. Lombardi, by virtue of his position with Matthews, owed a duty of loyalty to Matthews.

211. As stated herein, Lombardi breached that duty of loyalty owed to Matthews when, prior to the termination of his employment with Matthews and while being paid by Matthews, Lombardi established a company with the intent to compete with Matthews in the crematory services industry.

212. As a direct result of Lombardi's breaches of his obligations to Matthews, Matthews has been and will continue to be damaged.

**COUNT VII**
**Unfair Competition**
**(All Defendants)**

213. Matthews incorporates by reference Paragraphs 1 through 212 of the Verified Complaint as if set forth in full herein.

214.     Defendants, by engaging in the conduct described herein, have engaged in unfair competition with Matthews.

215.     Defendants' conduct has been and continues to be willful, intentional and unprivileged.

216.     Defendants' conduct is contrary to honest industrial and commercial practices.

217.     Defendants' intentional conduct has caused and will continue to cause damage to Matthews, its business relationships with its customers and prospective customers, and its other valuable business interests.

**COUNT VIII**
**Civil Conspiracy**
**(Lombardi, Stoveken, and Andrews)**

218.     Matthews incorporates by reference Paragraphs 1 through 217 of the Verified Complaint as if set forth in full herein.

219.     By engaging in the acts set forth above, the Individual Defendants conspired to knowingly, willfully and purposefully commit unlawful acts designed to unfairly compete with Matthews, misappropriate Matthews' Confidential Information and Trade Secrets, and solicit Matthews' employees and customers clients in violation of Stoveken's and Andrews' contractual obligations to Matthews.

220.     Upon information and belief, Defendants agreed, combined and acted with a common plan to breach the contractual and common law duties owed to Matthews by engaging in the unlawful acts described above.

221.     Defendants further conspired to do so with the specific intent to injure Matthews' business.

222.     Defendants' actions have been willful and outrageous and undertaken with reckless

indifference to Matthews' rights.

223.     As a direct and proximate result of the acts done in furtherance of the conspiracy, Matthews has been damaged, including damage in the form of expenses related to investigative and remedial actions taken to address the effects of the conspiracy. Matthews has suffered, and will continue to suffer, these injuries.

224.     The threatened and actual injuries that Matthews has suffered and will suffer are immediate and irreparable.

## PRAYER FOR RELIEF

WHEREFORE, Matthews respectfully requests that this Court enter an order:

1.     Awarding immediate and then permanent injunctive relief to Matthews as follows:

   a.     prohibiting Defendants from retaining, using, disclosing, or transmitting Confidential Information and Trade Secrets (as defined herein);

   b.     requiring Defendants to account for and immediately return to Matthews all original documents, records, and materials containing or reflecting such information, and all copies thereof;

   c.     requiring Defendants to submit their computers and electronic devices to a computer forensic expert to ensure that Matthews Confidential Information and Trade Secrets do not exist on those computers or devices;

   d.     prohibiting Defendants from destroying, altering, transmitting, or moving any documents, in whatever form, that contains Matthews' Confidential Information and Trade Secrets; and

   e.     enjoining Stoveken from violating his Agreement with Matthews in any manner;

   f.     enjoining Andrews from violating his Agreement with Matthews in any manner;

   g.     enjoining Defendants from tortiously interfering with Matthews' customer and employee relationships in any manner;

   h.     enjoining Defendants from any unfair competition; and

      i.    prohibiting or requiring any and all other such acts as the Court deems appropriate for injunctive relief.

2.    Awarding Matthews compensatory damages, including pre-judgment and post-judgment interest;

3.    Awarding Matthews its expenses and attorney's fees incurring in this litigation, as required by the DTSA and PUTSA; and

4.    Awarding any other relief as the Court may deem to be just and appropriate.

Dated: January 21, 2020             Respectfully submitted,

                              BUCHANAN INGERSOLL & ROONEY PC

                              By: */s/ Jaime S. Tuite*
                              Jaime S. Tuite, Esquire *(PA #87566)*
                              jaime.tuite@bipc.com
                              Ryan Wilk, Esquire *(PA #316696)*
                              ryan.wilk@bipc.com
                              Union Trust Building
                              501 Grant Street, Suite 200
                              Pittsburgh, PA 15219-1410
                              Phone:    (412) 562-8800
                              Facsimile: (412) 562-1041

                              *Attorneys for Plaintiff Matthews International Corporation*

## **VERIFICATION**

I, Steve Schaal, Division President – North America for Matthews, am authorized to execute this verification on behalf of Matthews. I have read the Verified Complaint, and I believe it to be true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: January 17, 2020

_____
Steve Schaal

Janis Luna
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG056491
Expires 12/20/2020