## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEWS INTERNATIONAL CORPORATION, | ) ) ) |
| | ) 2:20-cv-89-NR |
| Plaintiff, | ) ) |
| v. | ) ) |
| ANTHONY A. LOMBARDI, et al., | ) ) |
| Defendants. | ) ) |

### <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

This case concerns alleged trade secret misappropriation and improper competition by former employees of Plaintiff Matthews International Corporation. Matthews brings suit against several of its former employees (and their current employers), claiming that they stole trade secret information, went to work for a competitor in breach of their restrictive covenants, and have been using Matthews's information to gain a competitive advantage ever since. Matthews now seeks broad preliminary-injunctive relief, including asking the Court to order Defendants to refrain from further using Matthews's information, and refrain from further working for Matthews's competitor in a manner that competes with Matthews.

After careful consideration of the extensive evidentiary record, the Court will grant in part and deny in part Matthews's preliminary-injunction motion. The Court finds that Defendants have already agreed to much of the potential preliminary-injunctive relief, including to return and not use Matthews's information, and to abide by a document-remediation protocol. The Court will memorialize this agreed-to relief as part of its order. Additionally, the Court will enforce the terms of a restrictive covenant against one of Matthews's former employees, Defendant Gaetano Esposito, including by enjoining him from competing against Matthews for two years,

based on the terms of his restrictive covenant with Matthews. Beyond that, however, the Court concludes that Matthews has not met its burden to warrant any further preliminary-injunctive relief against Defendants, and will deny the remainder of its motion.

## PROCEDURAL BACKGROUND

On January 22, 2020, Matthews filed its original complaint against three of its former employees (Anthony Lombardi, Ronald Stoveken, and Michael Andrews), as well as the two related entities to where they went to work after leaving Matthews (Implant Recycling LLC, and IR Environmental Solutions LLC). ECF 1. Matthews brought several claims, including claims of trade secret misappropriation, breach of contract, conversion, tortious interference, and unfair competition. *Id.* Matthews also moved for a preliminary injunction. ECF 4. Following a status conference, the Court allowed expedited discovery, and scheduled an evidentiary hearing for March 30-31, 2020. ECF 20.

In February and March 2020, the parties reached several agreements. First, the parties agreed on a standstill agreement, where Defendants[1] agreed not to "use, access, [or] disclose to any person or entity [Matthews's] confidential, proprietary, or trade secret information." ECF 137-7, PDF pp. 3-4. In this standstill agreement, Defendants also agreed not to "enter into or expand Defendants' contracts with any customer with a Matthews' cremator and shall not service or support any Matthews cremators." *Id.* at PDF p. 4. This standstill agreement was to remain in effect at least until the Court ruled on Matthews's preliminary-injunction motion. *Id.* Additionally, the parties agreed to abide by a remediation protocol to ensure all of

---

[1] This standstill agreement was reached before several of the Defendants were added to this case. So not all of the Defendants are referenced in these agreements.

Matthews's information on Defendants' systems was returned to Matthews. *Id.* at PDF pp. 5-8.

Due to various delays and issues during discovery—some caused by the ongoing public-health crisis related to COVID-19—the Court postponed the evidentiary hearing, and amended the limits on discovery, several times. Eventually, the Court scheduled the evidentiary hearing on Matthews's preliminary-injunction motion for November 4-5, 2020. ECF 75. On October 20, 2020, however, Matthews filed an amended complaint (with the Court's leave). ECF 91. In the amended complaint, Matthews added five new Defendants: Gaetano Esposito, Christopher Brown, James Norton, Jarrod Gogel—who are all former Matthews employees—and Bradley Wasserman, who is the founder and owner of Implant. *Id.* Matthews's claims in the amended complaint include trade secret misappropriation, breach of contract, conversion, tortious interference, and unfair competition. *Id.* Because Matthews added several new Defendants, the Court postponed the evidentiary hearing to allow the newly added Defendants sufficient time to respond to the amended complaint and prepare for the hearing. ECF 100.

The Court held the evidentiary hearing on Matthews's preliminary-injunction motion on December 8-9 & 14-15, 2020, admitting certain exhibits and hearing testimony from 20 witnesses. ECF 123; ECF 124; ECF 126; ECF 127. Following the hearing, the Court granted the parties' joint motion to admit the exhibits, and overruled the few pending objections to certain exhibits. ECF 135. The parties filed

their post-hearing submissions on January 11, 2021.  ECF 146; ECF 148; ECF 149; ECF 150.  The matter is now ready for disposition.

## FINDINGS OF FACT

Based on the evidentiary record before the Court, including the exhibits submitted to the Court and the testimony presented at the hearing, the Court finds as follows:

## I.     The parties' respective businesses.

1.     Matthews Environmental Solutions ("MES") is the cremation division of Plaintiff Matthews's memorialization group.  MES provides, among other things, service and repair work on its customer's cremation equipment.  The Court adopts the contents of Matthews's proposed Findings of Fact (ECF 146) ("Matthews's proposed FOF") at ¶¶ 5, 7.

2.     Defendant Implant's business involves recycling the metallic by-products of the cremation process.  Implant offers a program, called the Implant Recycling Maximizer program, where Implant provides and services processors for its customer's cremation equipment.  Mr. Wasserman is the founder and owner of Implant.  ECF 133, p. 205:10-22.  The Court adopts the contents of Defendants' proposed Findings of Fact (ECF 149) ("Defendants' proposed FOF") at ¶¶ 1-2.

3.     In 2017, Matthews and Implant discussed the possibility of Matthews purchasing Implant.  The discussions ultimately fell through, and no acquisition occurred.  ECF 133, pp. 211:5-212:18.

4.     In May 2018, Defendant IR was formed to provide service and repair work to Implant's Maximizer customers on their cremation equipment.  The Court adopts the contents of Defendants' proposed FOF at ¶ 3.  *See also* ECF 101, ¶ 10.

5.     Several individuals, including the individually-named Defendants (other than Mr. Wasserman), have worked for both (i) Matthews or MES and (ii) Implant or IR.

## II.   Gaetano Esposito.

6.   One such individual is Mr. Esposito, who began working for Matthews in December 2004.  ECF 132, p. 137:19-20.  In July 2015, Matthews promoted Mr. Esposito to the position of Equipment Sales Representative.  ECF 91-1.  As part of this promotion, Mr. Esposito signed a Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement.  *Id.*  This agreement included a confidentiality obligation, non-compete obligation, and non-solicitation obligation. *Id.* at pp. 2-7.  The non-compete and non-solicitation obligations applied for two years after Mr. Esposito's employment with Matthews ended.  *Id.* at pp. 5-7.  The non-compete and non-solicitation obligations also contained a tolling provision that extends the restrictive period by the length of any breach of these obligations.  *Id.* at p. 10.

7.   Over his 11-year tenure at Matthews, Mr. Esposito sold cremation equipment, accessories, and maintenance and repair services for Matthews.  ECF 132, pp. 138:3-12, 141:4-11.  Mr. Esposito became very familiar with the cremation industry in general, and Matthews's customers more specifically.  *Id.* at pp. 141:12-143:22.  Part of Mr. Esposito's job was to develop relationships with Matthews's customers, and to do so, he had access to and used Matthews's confidential customer and sales information.  *Id.*  Upon his promotion in July 2015, Mr. Esposito served in a "key sales role."  *Id.* at p. 138:13-23.

8.   In October 2015, Mr. Esposito resigned from Matthews and joined Implant as its vice president, where he is the highest-ranking non-owner executive. *Id.* at pp. 137:21-23, 151:6-21.  Implant pays Mr. Esposito between $400,000 and $450,000 per year.  *Id.* at p. 151:13-18.

9.   Upon leaving Matthews and joining Implant, Mr. Esposito took with him thousands of Matthews's documents, including Matthews's confidential information.  *Id.* at pp. 147:7-148:11, 167:20-174:7, 183:10-184:20.  And upon arriving

at Implant, Mr. Esposito uploaded these documents to Implant's server, some of which he then used on behalf of Implant. *Id.* at pp. 148:5-11, 149:25-150:3, 183:10-184:20.

10.    Matthews did not learn of Mr. Esposito taking and using its documents until after this case began.  Thus, while Matthews initially consented to Mr. Esposito joining Implant, it did so without the knowledge that Mr. Esposito was taking—and would be using—Matthews's confidential information for Implant's benefit.  *E.g.*, *id.* at 147:18-24; ECF 130, p. 61:2-11.

11.    At Implant, Mr. Esposito focuses on bringing customers to Implant. ECF 132, p. 153:9-12.  Some of these customers are former, current, or prospective customers of Matthews.  *E.g.*, *id.* at pp. 168:8-176:12.

12.    Mr. Esposito was also involved in bringing some of Matthews's former employees to Implant.  Around February or March 2017, Mr. Esposito contacted Mr. Brown to discuss Mr. Brown leaving Matthews and joining Implant. *Id.* at pp. 145:10-146:10; ECF 137-10, PDF p. 4.  Mr. Esposito also provided Mr. Lombardi's contact information to Mr. Wasserman so that Mr. Wasserman could talk to Mr. Lombardi about joining IR.  ECF 132, pp. 144:21-145:9.

## III.   Christopher Brown.

13.    Mr. Brown began working for Matthews in July 2012, and signed a Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement as part of the hiring process.  ECF 91-2.  This agreement included a confidentiality obligation, non-compete obligation, and non-solicitation obligation. *Id.* at pp. 2-7.  The non-compete and non-solicitation obligations applied for two years after Mr. Brown's employment with Matthews ended.  *Id.* at pp. 6-7.  The non-compete and non-solicitation obligations also contained a tolling provision that

extends the restrictive period by the length of any breach of these obligations. *Id.* at p. 10.

14.     In April 2017, Mr. Brown resigned from Matthews and joined Implant. ECF 137-10, PDF p. 4.  At the time of his resignation, Mr. Brown informed Matthews that he was joining Implant, to which Matthews did not object.  *Id.*; ECF 132, pp. 271:24-272:6.

15.     When Mr. Brown joined Implant, his role was to service Implant's processors.  ECF 132, p. 272:7-13.  During his two-year restrictive period following his resignation from Matthews, Mr. Brown did not perform any work on Implant's or IR's behalf other than servicing processors.  ECF 133, p. 216:9-11.

16.     In 2018, Matthews raised concerns with Implant about Mr. Brown's role at Implant.   But after Matthews learned that Mr. Brown's role was limited to servicing processors for Implant, Matthews did not object to Mr. Brown working for Implant, and agreed Mr. Brown's employment did not violate his restrictive covenants.  ECF 38-1, ¶¶ 2-5; ECF 130, pp. 146:25-148:11; ECF 133, pp. 42:15-21, 51:10-18, 215:7-216:11.

## IV.    James Norton.

17.     Mr. Norton's situation is akin to Mr. Brown's.  In September 2006, Mr. Norton signed a Confidentiality and Non-Compete Agreement with Matthews, which contained confidentiality, non-compete, and non-solicitation obligations.  ECF 91-3. The non-compete obligation applied for one year after Mr. Norton's employment with Matthews ended, and the non-solicitation obligation applied for two years following termination.   *Id.* at p. 2.  The obligations also contained a tolling provision that

extends the restrictive period by the length of any breach of these obligations. *Id.* at p. 3.

18.    In October 2017, Mr. Norton resigned from Matthews and joined Implant. ECF 137-2.

19.    When Mr. Norton joined Implant, his role was to service Implant's processors.   ECF 133, p. 216:9-11.   During his restrictive period following his resignation from Matthews, Mr. Norton did not perform any work on Implant's or IR's behalf other than servicing processors. *Id.*

20.    In 2018, Matthews raised concerns with Implant about Mr. Norton's role at Implant.   But after Matthews learned that Mr. Norton's role was limited to servicing processors for Implant, Matthews did not object to Mr. Norton working for Implant, and agreed Mr. Norton's employment did not violate his restrictive covenants.   ECF 38-1, ¶¶ 2-5; ECF 130, pp. 146:25-149:8; ECF 133, pp. 42:15-21, 51:10-18, 215:7-216:11.

**V.    Anthony Lombardi.**

21.    Mr. Lombardi began working for Matthews in 1996.  ECF 133, p. 9:8-14. Over the years, Mr. Lombardi was promoted several times, including to the position of president from 2000-2002. *Id.* at pp. 10:9-12:4.   Following his two years as president, Mr. Lombardi held various senior roles for the remainder of his time at Matthews. *Id.* at p. 12:5-13.

22.    Due to his senior roles, Mr. Lombardi was eligible to participate in Matthews's Equity Incentive Plan and Matthews's Incentive Compensation Plan. ECF 91-4; ECF 91-5; ECF 131, pp. 116:2-117:16.   Under these plans, Mr. Lombardi received stock payments and other compensation from Matthews pursuant to the plans' terms. *Id.*

23.    In addition to outlining when a recipient is eligible for payment under the plans, the Equity Incentive Plan and the Incentive Compensation Plan require

some of these stock payments to be re-paid to Matthews if the recipient takes certain actions, including competing with Matthews and soliciting customers or employees away from Matthews.  ECF 91-4, p. 8; ECF 91-5, p. 9.

24.    Mr. Lombardi resigned from Matthews in September 2019.  ECF 131, p. 85:18-21; ECF 138-49.  Around one month later, he joined IR as its president.  ECF 131, p. 85:1-2; ECF 138-50, PDF pp. 1-12.

**VI.    Ronald Stoveken.**

25.    In 2000, Mr. Stoveken re-joined Matthews a couple of months after initially resigning from Matthews.  ECF 132, pp. 207:17-208:1.

26.    In September 2019, Matthews promoted Mr. Stoveken.  *Id.* at p. 215:18-24.  As part of this promotion, Mr. Stoveken's supervisor—Matthew Defibaugh, Division Senior Manager of Service for MES—emailed Mr. Stoveken a promotion letter and a confidentiality agreement (the latter of which being the agreement Matthews seeks to enforce in this case).  ECF 138-40, PDF p. 1.  Mr. Defibaugh requested that Mr. Stoveken sign and return the documents.  *Id.*  Mr. Stoveken responded that he will electronically sign "this" when he is able, and "except[s] [sic] everything I have read," though he did not specify what he had "read."  *Id.*; ECF 133, p. 123:1-3.

27.    The next day, Mr. Stoveken returned the signed promotion letter to Mr. Defibaugh.  However, Mr. Stoveken did not return the confidentiality agreement, despite Mr. Defibaugh specifically requesting it.  ECF 137-4, PDF p. 11; ECF 133, p. 123:4-23.

28.    Several months later, in November 2019, Matthews (through Mr. Defibaugh) again requested, on multiple occasions, that Mr. Stoveken sign and return the confidentiality agreement.  ECF 133, pp. 123:24-125:15; ECF 137-4, PDF pp. 13-24.  This included several requests from Mr. Defibaugh on November 5-6, 2019.  ECF 137-4, PDF pp. 24.  Yet, by November 7, 2019, Mr. Stoveken had not returned a signed

agreement to Matthews, and instead emailed Mr. Defibaugh his resignation letter. *Id.* at PDF pp. 24-28.  The Court also adopts the contents of Defendants' proposed FOF at ¶¶ 166-169.

29.   At some point, though it is unclear when, Mr. Stoveken's wife electronically signed the confidentiality agreement on Mr. Stoveken's behalf.  ECF 132, p. 219:14-24; ECF 138-40, PDF pp. 1-7.

30.   Mr. Stoveken's last day of employment at Matthews was in November 2019.  ECF 132, p. 195:5-7.  Mr. Stoveken then joined IR in December 2019.  *Id.* at p. 224:21-23.

**VII.   Michael Andrews.**

31.   As to Mr. Andrews, the Court adopts the contents of Defendants' proposed FOF at ¶¶ 176-179.  Additionally, in August 2014, Mr. Andrews was promoted to the position of "service technician," which required him to sign a Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement.  ECF 91-7.  This agreement included a confidentiality obligation, non-compete obligation, and non-solicitation obligation.  *Id.* at pp. 2-7.  The non-compete and non-solicitation obligations applied for two years after Mr. Andrews's employment with Matthews ended.  *Id.* at pp. 5-7.  The non-compete and non-solicitation obligations also contained a tolling provision that extends the restrictive period by the length of any breach of these obligations.  *Id.* at p. 10.

32.   Before Mr. Andrews was promoted to service technician, Matthews did not require him to sign any restrictive covenants in any of his previous roles, nor required anyone who held Mr. Andrews's previous positions to sign restrictive covenants.  ECF 133, p. 94:12-18.

33.   After being promoted to service technician in August 2014, Mr. Andrews held the role for only three months, before returning to his previous role as a shop

mechanic, a position in which Matthews does not require restrictive covenants to be signed.  ECF 132, pp. 243:21-244:7; ECF 133, p. 94:15-18.

34.    During his three months as a service technician, Mr. Andrews held the lowest position in the service-technician hierarchy.  ECF 132, p. 260:11-15, 262:3-9. In his role traveling to customer sites, his job was to assist in the delivery of cremation equipment by unloading the cremation equipment, and placing the equipment inside the building.   *Id.* at pp. 260:22-261:14.   If he encountered the customer, the interaction would essentially amount to a greeting and logistical instructions regarding the delivery.  *Id.* at pp. 261:15-262:2.

35.    When Mr. Andrews returned to his previous position, the purpose of any travel he did to customer sites was to assist primarily in the delivery of the cremation equipment.  *Id.* at pp. 244:5-245:3, 245:20-246:8.

36.    Mr. Andrews resigned from Matthews in November 2019.  *Id.* at p. 250:15-17.  He then joined IR.

**VIII.  Jarrod Gogel.**

37.    Matthews promoted Mr. Gogel in 2016 to a sales representative position, which required Mr. Gogel to sign a Confidentiality, Non-Solicitation, Non-Competition, and Intellectual Property Agreement.  ECF 91-8.  This agreement included a confidentiality obligation, non-compete obligation, and non-solicitation obligation.  *Id.* at pp. 2-7.  The non-compete and non-solicitation obligations applied for two years after Mr. Gogel's employment with Matthews ended.  *Id.* at pp. 5-7.  The non-compete and non-solicitation obligations also contained a tolling provision that extends the restrictive period by the length of any breach of these obligations.  *Id.* at p. 10.

38.    Prior to his promotion as a sales representative, Mr. Gogel worked on design drawings and permitting for Matthews.  Mr. Gogel also had several years of

experience doing drafting and design work before joining Matthews (though not in the cremation industry).  ECF 140-21; ECF 131, pp. 82:21-83:4.

39.    In 2018, Matthews terminated Mr. Gogel for unsatisfactory performance, including for "upset[ting] customers and [causing] major delays in service."  ECF 137-12, PDF p. 5.  Matthews concluded that Mr. Gogel's termination was necessary because Matthews "can no longer continue to allow [Mr. Gogel's] lack of responsiveness to our customers as it is greatly impacting our business."  *Id.*

40.    In January 2020, Implant hired Mr. Gogel, which lasted for two months, followed by Implant hiring Mr. Gogel again in August 2020.  ECF 131, pp. 70:23-71:19, 79:11-18.  Mr. Gogel performs drafting and design work for Implant, and has performed no sales-related work for Implant or IR.  *Id.* at pp. 80:19-24, 82:15-25.

## IX.    Matthews's trade secrets.

41.    Matthews owns various trade secrets, and has taken reasonable measures to protect its trade secrets.  Such reasonable measures include using a password-protected server and network, limiting the access to certain information, and adopting a code of conduct that prohibits the disclosure of trade secrets.  *E.g.*, ECF 130, pp. 99:10-17, 240:7-246:11, 248:14-250:17, 255:3-256:20, 258:8-261:12; ECF 133, pp. 108:19-109:11.

42.    Some of Matthews's purported trade secrets are indeed trade secrets, while others are not.  For example, current customer pricing and sales information, proprietary electrical schematics, and certain customer maintenance information from the last two years, are likely trade secrets due to their value in being kept secret.  *E.g.*, ECF 130, pp. 60:14-61:1, 70:12-71:17, 77:1-20; ECF 131, pp. 14:2-16:7, 46:25-47:23.  But other information, such as general cremator-hardware designs and lists of the particular equipment a customer has, are likely not trade secrets due to the

ability of others to readily discern this information.[2]  *E.g.*, ECF 130, pp. 168:7-169:2; ECF 131, 36:19-37:6.

**LEGAL STANDARD**

"The decision to grant or deny a preliminary injunction is within the sound discretion of the district court."  *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. N.J.*, 910 F.3d 106, 114 (3d Cir. 2018) (citation omitted).  But preliminary-injunctive relief is an "extraordinary remedy" that "should be granted only in limited circumstances."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (cleaned up).  "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017).  If the plaintiff is unable to meet either of the first two factors, the motion for a preliminary injunction fails at the outset.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("A movant for preliminary equitable relief must meet the threshold for the first two most critical factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." (cleaned up)).

---

[2] As discussed below, the issue of trade-secret protection does not need to be definitively decided at this stage.

## DISCUSSION & ANALYSIS

### I.   Defendants have narrowed the scope of potential injunctive relief.

Matthews seeks broad injunctive relief. *See* ECF 148-1. But before and after the preliminary-injunction hearing, Defendants, by agreement and representations to the Court, have narrowed the potential relief at issue.

That is, by way of a prior standstill agreement between the parties, and Defendants' post-hearing briefing, Defendants represent that they "have already agreed to return Matthews's information, regardless of whether it qualifies for trade secret protection, and to not use Matthews's information." ECF 150, p. 37; *see also* ECF 137-7, PDF pp. 3-4. Further, Defendants, as part of the standstill agreement, have "agreed that they 'shall not, on behalf of any Defendants, enter into or expand Defendants' contracts with any customer with a Matthews's cremator and shall not service or support any Matthews cremators.'" ECF 150, p. 3; *see also* ECF 137-7, PDF p. 4. Defendants also agreed to abide by a remediation protocol to ensure that all of Matthews's information on Defendants' systems is returned to Matthews. ECF 150, p. 40; ECF 137-7, PDF pp. 5-8. And in their post-hearing brief, Defendants represent that Matthews's requested preliminary-injunctive relief is not needed ***because*** Defendants will continue to comply with these agreements. *E.g.*, ECF 150, pp. 3, 37, 40.[3]

Thus, in light of Defendants' representations to the Court, the Court will enter an order memorializing this agreed-to relief.[4] *See Meyer v. CUNA Mut. Ins. Soc.*, 648

---

[3] Originally, Defendants' prior agreements were more limited because they appeared to expire upon the Court deciding the motion for preliminary injunction, and they were not amended to include the newly added Defendants. But Defendants' post-hearing brief makes clear that all Defendants intend to abide by these agreements, and to do so regardless of the Court's decision on the pending motion. *E.g.*, ECF 150, pp. 3, 37, 40.

[4] Because Defendants agree to this relief, the Court will condition this aspect of the injunctive relief on Matthews posting only a nominal bond of $100. *See Pomicter v.*

F.3d 154, 169 (3d Cir. 2011) ("District courts are afforded considerable discretion in framing injunctions.") (citations omitted).  In short, Defendants will return and not use Matthews's information, will remediate their systems in compliance with an agreed-to protocol, and will not provide cremator-service to any customers that presently have Matthews's cremators.[5]

From this "baseline," then, the question is whether Matthews is entitled to any additional relief.   Matthews requests additional injunctive relief that would more

---

*Luzerne Cty. Convention Ctr. Auth.*, No. 16-cv-632, 2016 WL 1706165, at *8 (M.D. Pa. April 27, 2016) ("Defendants [do not] offer evidence regarding the extent that the proposed injunction will occasion financial loss. In similar circumstances courts in this Circuit have required the moving party to post a nominal bond."); *see also* Fed. R. Civ. P. 65(c).

[5] This agreed-to relief protects Matthews from the alleged misappropriation and conversion of its trade secrets and confidential information, as well as remedies (at this time) any contractual breach-of-confidentiality claims. *Cf. Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992) ("[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm, but here the record shows [Defendant] had discontinued its past use of [Plaintiff's] process and has no plans to renew its . . . project [and thus, there was no irreparable harm]."). Indeed, much of the evidentiary hearing focused on whether Matthews's information qualified as trade secrets. The Court finds that some did, and some didn't.  To begin with, Matthews has taken sufficient measures to protect much of the information, such as by having employees abide by the code of conduct, using passwords, keeping the information on secure servers, and limiting disclosure of the information. FOF, ¶ 41. This requirement is not a high bar for an employer, and Matthews has met it. *See Mallet & Co. v. Lacayo*, No. 19-1409, 2020 WL 6866386, at *8 (W.D. Pa. Nov. 23, 2020) (Bissoon, J.) (noting that an employer "need not undertake every available option to have acted reasonably" in protecting its trade secrets). But the different categories of Matthews's information, when considering the economic value of its secrecy, differ vastly in terms of what is and isn't a trade secret. Current customer pricing and sales information, proprietary electrical schematics, and certain customer maintenance information kept for the last two years, broadly speaking, are likely trade secrets. FOF, ¶ 42. But, based on the evidence submitted, information such as general cremator-hardware designs and the particular equipment a customer has, appear to have materially less economic value or can be easily reverse engineered, and therefore do not appear to be trade secrets. *Id.* The Court at this juncture, however, need not

broadly limit Defendants' ability to compete.  Specifically, Matthews requests an order that would limit Defendants' ability to do business with any former or prospective Matthews customer, would enjoin Defendants from soliciting any additional Matthews employees, and would hinder Defendants' ability to work for Implant or IR.

This broader injunctive relief is tied to Defendants' non-compete and non-solicitation provisions in their restrictive covenants with Matthews.  For the reasons discussed below, however, there are a variety of problems in enforcing these restrictive covenants.  Therefore, except as to Mr. Esposito, the Court concludes that the additional injunctive relief that Matthews seeks here is inappropriate.[6]

## II.   Except as to Mr. Esposito, Matthews is not entitled to any broader preliminary-injunctive relief that further limits Defendants' ability to work for IR or Implant.

For the reasons discussed below, the Court finds that Matthews is not entitled to preliminary-injunctive relief on its breach-of-contract claims against any of the Defendants, other than Mr. Esposito.

To succeed on a breach-of-contract claim, the plaintiff must show "(1) the existence of a valid contract, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (cleaned up).  Additionally, in this context, the plaintiff must show that the

---

detail which information is appropriately considered a trade secret, in light of Defendants' agreement to return, and not use, all of Matthews's information.

[6] In light of Defendants' representations that they will continue to abide by the standstill and remediation agreements, and the Court's conclusions as to Matthews's breach-of-contract claims, the Court finds that Matthews is not entitled to any additional preliminary-injunctive relief on any of its other claims.

restrictive covenants are enforceable. *See Softmart Commercial Servs. Inc. v. Mariani*, No. 461 EDA 2015, 2015 WL 6758252, at *3 (Pa. Super. Ct. Nov. 4, 2015).

### A.    Anthony Lombardi.

While Matthews alleges that Mr. Lombardi breached various contractual obligations to Matthews, the Court finds that, even if Mr. Lombardi breached his contractual obligations, Matthews will not suffer irreparable harm. So preliminary-injunctive relief is not warranted.

Matthews alleges that Mr. Lombardi breached the non-compete and non-solicitation clauses in its (1) Equity Incentive Plan and (2) Incentive Compensation Plan. *See* ECF 91, ¶¶ 314-328; ECF 91-4, pp. 8-9; ECF 91-5, p. 9; FOF, ¶¶ 22-23. Yet these agreements, as written, make clear that a breach of the obligations results in legal, not equitable, relief. The agreements expressly provide that such breaches result in Mr. Lombardi having to return certain stock payments and other compensation that he received under the agreements. *See* FOF, ¶¶ 22-23; ECF 91-4, pp. 8-9; ECF 91-5, p. 9.[7]  As such, if Mr. Lombardi breached the agreements,

---

[7] The Equity Incentive Plan, in part, provides that if the receiver of the stock payments "engages in the operation or management of a business . . . which is in competition with [Matthews]," "induces or attempts to induce" Matthews's customers to cease doing business with Matthews, or "solicits any employee" of Matthews to leave their employment, then Matthews may cause the person's stock payments to be "immediately forfeited . . . and/or require the . . . prompt[] return and transfer" of the stock. *E.g.*, ECF 91-4, p. 8. Similarly, the Incentive Compensation Plan provides in part that "[a]ny or all outstanding Incentive Awards granted to a participant may . . . be cancelled, suspended, or required to be repaid to [Matthews] if" the person competes with Matthews, induces Matthews's customers to cease doing business with Matthews, or solicits Matthews's employees to leave their employment. *E.g.*, ECF 91-5, p. 9.

Matthews has an adequate remedy at law—the damages that the express terms of the agreements specify.

Put differently, the parties, ex ante, specifically contracted the appropriate value of any breach of the non-compete and non-solicitation obligations.[8]  Based on the terms of their bargain, Matthews's remedy is legal, thereby making injunctive relief inappropriate.  *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("In order to demonstrate irreparable harm, the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the *only* way of protecting the plaintiff from harm." (cleaned up)).

Matthews therefore is not entitled to preliminary-injunctive relief on its breach-of-contract claim against Mr. Lombardi.

### B.    Ronald Stoveken.

Matthews alleges that Mr. Stoveken breached the non-compete, non-solicitation, and confidentiality clauses of a purported contract between Matthews and Mr. Stoveken.  *E.g.*, ECF 91, ¶¶ 182-191, 329-332; ECF 91-6.  The Court concludes, however, that Matthews has failed to meet its burden to show a likelihood of success on its breach-of-contract claim against Mr. Stoveken.  Specifically, the

---

[8] Indeed, Matthews's Equity Incentive Plan and Incentive Compensation Plan do not actually create a contractual obligation on Mr. Lombardi to refrain from competing with Matthews or refrain from soliciting Matthews's customers and employees. Rather, these agreements simply establish that *if* Mr. Lombardi does these things, he must re-pay some of the compensation that he received pursuant to these agreements.  In other words, the only contractual obligation is to re-pay the designated compensation.  This further weighs against a preliminary injunction.  *See Checker Cab of Phila. v. Uber Tech.*, 643 F. App'x 229, 232 (3d Cir. 2016) ("[Irreparable harm] is not an easy burden. Plaintiff must demonstrate a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages. Accordingly, it is clear that this Court has long held that an injury measured in solely monetary terms cannot constitute irreparable harm." (cleaned up)).

Court finds that Matthews has not shown it can enforce the contract against Mr. Stoveken, because Mr. Stoveken did not agree to the contract. Accordingly, preliminary-injunctive relief is not warranted.

"The first element of the test for enforceability of a contract is whether both parties manifested an intention to be bound. In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd*., 584 F.3d 575, 582 (3d Cir. 2009) (citations omitted); *Bush v. Comcast Cable Commc'n Mgmt.*, No. 19-1004, 2020 WL 4199077, at *9 (W.D. Pa. July 22, 2020) (Ranjan, J.) (same).

Applying this standard here, and based on the evidence presented, the Court finds that Mr. Stoveken did not agree to the contract, thus rendering it unenforceable. To initially effectuate the agreement Matthews now seeks to enforce, Mr. Defibaugh—a Division Senior Manager of Matthews—emailed Mr. Stoveken a promotion letter and a confidentiality/non-compete agreement for Mr. Stoveken to sign. FOF ¶ 26. While Mr. Stoveken responded that he will electronically sign "this" when he is able, and "except[s] [sic] everything I have read," he never specified what he had "read." FOF ¶¶ 26-27. Instead, the following day, Mr. Stoveken—despite knowing that Matthews also requested a signed copy of the separate confidentiality/non-compete agreement—signed and returned ***only*** the promotion letter. FOF ¶ 27.

What's more, Matthews continually tried to get Mr. Stoveken to sign and return the agreement. But he did not. Almost two months after Mr. Stoveken received the confidentiality/non-compete agreement, and signed the promotion letter, Matthews was still asking Mr. Stoveken to sign and return the agreement. FOF ¶ 28.

After multiple requests from Matthews, Mr. Stoveken responded, not with the signed confidentiality/non-compete agreement, but with his resignation letter.  FOF ¶ 28.

Further, while Mr. Stoveken's wife apparently signed the confidentiality/non-compete agreement on Mr. Stoveken's behalf at some point, the surrounding circumstances are unclear.  To begin with, there is insufficient evidence as to when Mr. Stoveken's wife signed the agreement, and when there was a meeting of the minds between Mr. Stoveken and Matthews.  And while Mr. Stoveken admits that his wife signed the agreement on his behalf (FOF ¶ 29), Matthews never received a signed agreement, as evidenced by its repeated efforts to obtain a signed copy from Mr. Stoveken.  FOF ¶ 28.  Additionally, Mr. Stoveken submitted his resignation letter **before** Matthews could have received a signed copy of the agreement.  FOF ¶ 28.

Based on this evidence, and applying an objective "reasonable person" standard, the Court finds that there was no meeting of the minds and no intent by Mr. Stoveken to be bound.  Therefore, Matthews cannot show a reasonable likelihood of success on any claim against Mr. Stoveken predicated on the confidentiality/non-compete agreement.[9]  Preliminary-injunctive relief is inappropriate.

### C.    Christopher Brown and James Norton.

Matthews asserts that Mr. Brown and Mr. Norton, by working for Implant or IR, each breached the non-compete and non-solicitation clauses of their agreement

---

[9] The Court also finds that the parties intended for the agreements to be signed in order to be effective, which further bolsters the Court's conclusion.  *See, e.g.*, *Commerce Bank/Pa. v. First Union Nat'l Bank*, 911 A.2d 133, 145 (Pa. Super. Ct. 2006) ("As a general rule, signatures are not required unless such signing is expressly required by law or **by the intent of the parties**." (emphasis added)).  When Mr. Defibaugh originally emailed Mr. Stoveken the promotion letter and the confidentiality/non-compete agreement for Mr. Stoveken's acceptance, Mr. Defibaugh requested that Mr. Stoveken sign the agreements.  FOF ¶ 26.  Mr. Stoveken chose to sign the promotion letter, but not the confidentiality/non-compete agreement, thus indicating his non-acceptance of the latter.  FOF ¶ 27.  And further, Matthews clearly found the lack of a signed agreement significant, as Matthews repeatedly requested Mr. Stoveken to sign and return the confidentiality/non-compete agreement.  FOF ¶

with Matthews. *E.g.*, ECF 91, ¶¶ 306-313. But the Court concludes that preliminary-injunctive relief on these claims is not warranted because Matthews has not sufficiently shown that Mr. Brown and Mr. Norton breached these restrictive covenants.

When Mr. Brown and Mr. Norton left Matthews to begin working for Implant, Matthews approved it, and either had no issues with it at the outset or had no issues with it after Mr. Wasserman assured Matthews of Mr. Brown's and Mr. Norton's role at Implant. FOF ¶¶ 14, 16, 20. Specifically, during the period when their restrictive covenants were in effect, Mr. Brown and Mr. Norton worked only on processors for Implant, which Matthews agreed did not violate the restrictive covenants. FOF ¶¶ 14-16, 19-20. Mr. Wasserman credibly testified that neither Mr. Brown nor Mr. Norton "ever perform[ed] any work on anything except processors during their restricted periods." ECF 133, p. 216:9-11.

Matthews has not presented sufficient evidence for the Court to conclude otherwise. As Matthews acknowledged that Mr. Brown's and Mr. Norton's role at Implant did not violate the restrictive covenants, and as the evidence reflects that Mr. Brown's and Mr. Norton's role was limited to that non-competing-role during the restrictive period, the Court finds that Matthews has not met its burden of showing a likelihood of success on these breach-of-contract claims.

### D.     Michael Andrews and Jarrod Gogel.

Matthews asserts that Mr. Andrews and Mr. Gogel, by working for Implant or IR, each breached the non-compete and non-solicitation clauses of their agreements with Matthews. *E.g.*, ECF 91, ¶¶ 333-340. Because the Court finds that Matthews has not shown a likelihood of success on the merits—namely, the enforceability of

---

28. The Court therefore finds that the parties' intent was that Mr. Stoveken had to sign the agreement for it to be enforceable.

these restrictive covenants—the Court concludes that preliminary-injunctive relief on these claims is not warranted.

"[R]estrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." *Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (Pa. 2002) (citation omitted). To be enforceable, restrictive covenants, like the non-compete and non-solicitation obligations at issue here, must be "reasonably necessary for the protection of the employer" and be "reasonably limited in duration and geographic extent." *Id.* (cleaned up). In making this determination, the Court balances the employer's legitimate business interests against the employee's interest in earning a living in his chosen profession. *Id.* at 920; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) ("To be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests."). An employer's legitimate business interests can include protecting "trade secrets, confidential information, good will, and unique or extraordinary skills." *Hess*, 808 A.2d at 920. When the restrictive covenants go beyond what is "reasonably necessary," the court may limit the restrictions. *See, e.g.*, *id.* at 920-21; *Diodato v. Wells Fargo Ins. Serv., USA*, 44 F. Supp. 3d 541, 569 (M.D. Pa. 2014).

Turning first to Mr. Andrews, the Court concludes that Matthews has failed to show that enforcing the non-compete and non-solicitation clauses is reasonably necessary to protect Matthews's business interests.

Mr. Andrews became subject to these restrictive covenants upon his promotion to the position of "service technician" in 2014. FOF ¶ 31. Yet Mr. Andrews credibly testified that he served in this role for only three months, before returning to his previous role as a shop mechanic, a position in which Matthews does ***not*** require restrictive covenants to be signed. FOF ¶¶ 32-33; ECF 132, pp. 243:21-244:7. During his three months as a service technician, Mr. Andrews held the lowest position in the

service-technician hierarchy, serving simply as a "helper" who did the "grunt work," such as carrying bricks and similar "hard labor."  FOF ¶ 34; ECF 132, p. 262:3-9. Though he traveled to customer sites, his role was to simply assist in unloading the cremation equipment, and placing the equipment inside the building—in other words, he assisted only in the delivery of the cremation equipment.  FOF ¶ 34.  And his interactions with the customer were negligible.  FOF ¶ 34.  Additionally, to the extent he traveled to customer sites after returning to his shop-mechanic role—again, a role in which Matthews does not require restrictive covenants to be signed—it was likewise to assist primarily in the delivery of the cremation equipment.  FOF ¶ 35.

Given this evidence, the Court does not find that enforcing the restrictive covenants against Mr. Andrews is reasonably necessary to protect Matthews's business interests, especially when weighed against Mr. Andrews's interest in earning a living in his chosen field.  Accordingly, the Court concludes that Matthews has not shown a reasonable likelihood of success to warrant a preliminary injunction.

As to Mr. Gogel, the Court also concludes that Matthews has not shown that the restrictive covenants are reasonably necessary to protect Matthews's legitimate business interests, but for different reasons.

Matthews fired Mr. Gogel for "unsatisfactory performance" (FOF ¶ 39), which undercuts any necessity by Matthews to restrict Mr. Gogel's future employment.  *See Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 735 (Pa. Super. Ct. 1995) ("The employer who fires an employee for failing to perform in a manner that promotes the employer's business interests deems the employee worthless. Once such a determination is made by the employer, the need to protect itself from the former employee is diminished by the fact that the employee's worth to the corporation is presumably insignificant. Under such circumstances, we conclude that it is unreasonable as a matter of law to permit the employer to retain unfettered control

over that which it has effectively discarded as worthless to its legitimate business interests.").

Indeed, Matthews terminated Mr. Gogel for "upset[ting] customers and [causing] major delays in service." FOF ¶ 39. Matthews thus terminated Mr. Gogel because Matthews "can no longer continue to allow [Mr. Gogel's] lack of responsiveness to our customers as it is greatly impacting our business." FOF ¶ 39. Clearly, then, Matthews determined Mr. Gogel "as worthless to its legitimate business interests." *See Brobston*, 667 A.2d at 735; *see also Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 801 (E.D. Pa. 2011) ("[E]nforcement of a non-competition agreement against an employee terminated for poor performance is generally disfavored. As the parties do not dispute that [the employee] was terminated for poor performance, this factor weighs heavily against enforcement."). Accordingly, Mr. Gogel's involuntary termination weighs strongly in favor of finding his restrictive covenants unenforceable.[10]

But even beyond Mr. Gogel's involuntary termination, the Court finds that the restrictive covenants are likely still unenforceable for not being reasonably necessary to protect Matthews's business interests. *See Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 538-39 (Pa. Super. Ct. 2010) ("[T]he circumstance under which the employment relationship was terminated is but one important factor to consider in assessing both

---

[10] Though Mr. Gogel's agreement with Matthews contains a clause stating that the agreement remains effective regardless of whether Mr. Gogel is involuntarily terminated (ECF 91-8, PDF p. 9), this does not change the analysis. This is because the Court must look beyond the terms of the contract to determine whether the employer has legitimate business interests that must be protected. *See Hess*, 808 A.2d at 920-21. An employee's involuntary termination belies the employer's legitimate business interests. *See Brobston*, 667 A.2d at 735. As such, because this analysis must go beyond the terms of the contract, a clause within the contract cannot render an otherwise unenforceable restriction enforceable.

the employer's protective interests and the employee's ability to earn a living." (cleaned up)).

To the extent Mr. Gogel had access to confidential information while at Matthews, that is remedied by the standstill and remediation agreements addressed above. Further, the reason Matthews felt it was necessary for Mr. Gogel to sign the non-compete/non-solicitation agreement was his promotion to an inside sales representative position. FOF ¶ 37. But Mr. Gogel was not hired by Implant or IR to do sales-related work, and he has not performed any sales-related work for Implant or IR. FOF ¶ 40. Thus, the basis for Matthews requiring Mr. Gogel to enter the restrictive covenants is not at issue in his current role. What's more, in his current role at Implant, Mr. Gogel performs drafting and design work. FOF ¶ 40. Mr. Gogel had several years of experience doing this drafting and design work before joining Matthews (albeit not in the cremation industry), and thus had much of the requisite experience before joining Matthews. FOF ¶ 38. This further weighs against Mr. Gogel's restrictive covenants being reasonably necessary to protect Matthews's business interests.

All told, as with Mr. Andrews, the Court does not find that enforcing the restrictive covenants against Mr. Gogel is reasonably necessary to protect Matthews's business interests, when weighed against Mr. Gogel's interest in earning a living in his chosen field. Accordingly, the Court concludes that Matthews has not shown a reasonable likelihood of success to warrant a preliminary injunction.

### E.   Gaetano Esposito.

Mr. Esposito's situation, on the other hand, is entirely different from the other former Matthews employees discussed above. There is no question that Mr. Esposito left Matthews, took with him Matthews's confidential information, and used that information while working for Implant. It is equally clear that Mr. Esposito is a highly compensated executive with meaningful customer contact—in other words,

he's positioned to trade on Matthews's goodwill.   And there is also no question that Mr. Esposito had a role in at least one former Matthews employee leaving Matthews and joining Implant.   The Court thus concludes that preliminary-injunctive relief is appropriate as to Matthews's breach-of-contract claim against Mr. Esposito.

Matthews alleges that Mr. Esposito breached the confidentiality, non-solicitation, and non-compete obligations of his agreement with Matthews. *E.g.*, ECF 91, ¶¶ 302-305.   As to any breach by Mr. Esposito of his confidentiality obligations, the standstill and remediation agreements provide an adequate remedy to Matthews at this time, as discussed above.   But the Court finds that Matthews is entitled to additional relief as to Mr. Esposito's non-solicitation and non-compete obligations.

### 1.   Likelihood of success on the merits.

Mr. Esposito's non-solicitation obligations include refraining from "directly or indirectly induc[ing] or attempt[ing] to induce any of Matthews' employees to leave their employment with Matthews."[11]   ECF 91-1, p. 7.   This obligation lasted for two years after his employment with Matthews ended—which would be October 2017 (subject to a tolling provision, discussed below).   *Id.*   Likewise, Mr. Esposito's non-compete obligations require him to not "directly or indirectly engage in, consult with, or have any interest in any business . . . which engages in a business competitive with [MES]."   *Id.* at p. 6.   This obligation also lasted for two years after his employment with Matthews ended (subject to a tolling provision).   *Id.*

Matthews has shown a reasonable likelihood of success on its breach-of-contract claim.   To begin with, the Court finds that these restrictive covenants are enforceable as they are reasonably necessary to protect Matthews's legitimate business interests.   Mr. Esposito worked at Matthews in sales for 11 years, and when he resigned from Matthews, he was serving in a key sales role.   FOF ¶ 7.   At

---

[11] A separate non-solicitation obligation also prevents Mr. Esposito from soliciting current or prospective Matthews customers on another's behalf.   ECF 91-1, p. 6.

Matthews, Mr. Esposito gained significant experience with cremation equipment and developed relationships with many of Matthews's customers.  FOF ¶ 7.  He also had access to confidential customer and sales information.  FOF ¶ 7.  And when Mr. Esposito resigned from Matthews and joined Implant, he took with him many documents from Matthews, including confidential and trade secret information.  FOF ¶ 9.

In October 2015, Mr. Esposito resigned from Matthews and joined Implant as its vice president, making him Implant's highest-ranking non-owner executive.  FOF ¶ 8.  After joining Implant, Mr. Esposito put the Matthews documents that he took onto Implant's server, and he used some of the documents in working for Implant.  FOF ¶ 9.  Further, Mr. Esposito, in his role at Implant, is tasked with bringing customers to Implant.  FOF ¶ 11.  Thus, Mr. Esposito's position at Implant is to interact with customers, many of whom are also former, current, or prospective customers of Matthews.  FOF ¶ 11.

Considering Mr. Esposito's role at Matthews, the information he had access to and brought to Implant, and Mr. Esposito's role at Implant, the Court finds that the restrictive covenants are reasonably necessary to protect Matthews's business interests, particularly Matthews's goodwill, and are thus enforceable.  *See Hess*, 808 A.2d at 920 ("Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills." (citation omitted)); *see also id.* at 922 ("This Court has defined good will as that which represents a preexisting relationship arising from a continuous course of business.  The Court has also explained that good will is essentially the positive reputation that a particular business enjoys." (cleaned up)).  The Court also finds that the restrictive

covenants' geographic extent[12] and two-year duration are reasonable, considering Mr. Esposito's knowledge and developed-relationships with Matthews's customers.

The Court next concludes that Matthews has met its burden of showing that Mr. Esposito likely breached his restrictive covenants. First, as to his non-solicitation obligations, Mr. Esposito admitted to contacting Mr. Brown in 2017 to discuss Mr. Brown leaving Matthews and joining Implant. FOF ¶ 12; ECF 132, pp. 145:10-146:10. And Mr. Esposito was successful, as Mr. Brown did, in fact, leave Matthews and join Implant shortly thereafter. FOF ¶ 14. Mr. Esposito's solicitation of Mr. Brown occurred within the restrictive period, and thus Mr. Esposito was still subject to his non-solicitation obligations. Accordingly, the Court finds that Matthews has met its burden as to likelihood of success.[13]

Likewise, the Court finds that Matthews has met its burden as to Mr. Esposito's likely breach of his non-compete obligations. As discussed above, Mr. Esposito took numerous documents when he left Matthews, including confidential and trade secret information. He uploaded these documents to Implant's server so that other Implant and IR employees could access them. And he further used some of the documents himself while working on behalf of Implant, as a high-level executive. Even if Mr. Esposito's official position is with Implant, rather than IR, these actions clearly served both Implant's and IR's interest, at Matthews's expense.

Further, while IR was not officially formed until May 2018 (*i.e.*, over two years after Mr. Esposito left Matthews), Implant was certainly taking steps to form IR as a

[12] The non-compete agreement specifies that it applies to Mr. Esposito's "assigned territory of Ohio, Georgia, Oklahoma, Arkansas, New Mexico and South Dakota and any other territory assigned to [Mr. Esposito] during his employment with Matthews." ECF 91-1, p. 6. Mr. Esposito has not argued that the geographical scope of this area is unreasonable, and the Court finds that it is reasonably limited in scope.

[13] Mr. Esposito also played a role in IR hiring Mr. Lombardi. Mr. Esposito gave Mr. Lombardi's contact information to Mr. Wasserman, so Mr. Wasserman could contact Mr. Lombardi while Mr. Lombardi was still at Matthews. FOF ¶ 12.

player in the cremation industry that could compete with MES. Indeed, in 2017, Implant discussed with Matthews its possible purchase of Implant. FOF ¶ 3. These discussions occurred following Implant's possession of Matthews's confidential information for over a year (without Matthews's knowledge), courtesy of Mr. Esposito. Ultimately, considering Mr. Esposito's actions and circumstances, the Court does not find it credible that Mr. Esposito's actions were consistent with his non-compete obligations. Matthews has met its burden.

Defendants raise three primary arguments against enforcing Mr. Esposito's restrictive covenants—none of which are persuasive.

First, Defendants argue that Matthews initially gave Mr. Esposito permission to work for Implant. But Matthews was not aware that Mr. Esposito was taking and using its confidential and trade secret information. FOF ¶¶ 9-10. Any consent that Matthews provided to Mr. Esposito was thus not knowingly made, and is not dispositive here.

Second, Defendants argue that Mr. Esposito's two-year restrictive period has expired. The Court disagrees. Mr. Esposito's contract with Matthews contains a tolling provision, such that Mr. Esposito's non-compete and non-solicitation obligations are extended by the length of any breaches of these obligations. ECF 91-1, p. 10. Based on the evidence presented, the Court concludes that Mr. Esposito likely breached his non-compete obligations since he first joined Implant, armed with Matthews's confidential information, and thus the tolling provision applies and provides a full two-year restrictive period, commencing as of today.

Third, Defendants argue that Matthews has delayed in seeking injunctive relief. But the Court finds that Matthews reasonably was not aware of Mr. Esposito's actions prior to this case.[14] As such, the Court concludes that any delay by Matthews

---

[14] Indeed, the discovery produced by Mr. Esposito in this case, itself, appears to have been untimely. As Matthews credibly represented to the Court during a status

in bringing its claims against Mr. Esposito is justified, and does not preclude Matthews's claims. *See, e.g.*, *Mallet and Co. v. Lacayo*, No. 19-1409, 2020 WL 6866386, at *10 (W.D. Pa. Nov. 23, 2020) (Bissoon, J.) ("Defendants' purposeful concealment, moreover, excuses any delay in [Plaintiff] bringing suit." (cleaned up)).

Accordingly, the Court finds that Matthews has shown a reasonable likelihood of success on its breach-of-contract claim against Mr. Esposito.

### 2.    Irreparable harm.

Turning next to irreparable harm, the Court finds that Matthews has also met this burden.

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Pappan Enter., Inc. v. Hardee's Food Sys.*, 143 F.3d 800, 805 (3d Cir. 1998) (citation omitted).   Additionally, "harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages." *Mallet*, 2020 WL 6866386, at *11 (cleaned up).

The Court concludes there are multiple bases to find irreparable harm here. First, as discussed above, through his role at Matthews, Mr. Esposito developed relationships with many of Matthews's customers.   And in his current role at Implant, Mr. Esposito is likewise tasked with developing and expanding relationships with customers, many of whom overlap with Matthews.   As such, the Court finds that Matthews has shown irreparable harm by the loss of goodwill that Mr. Esposito can cause Matthews.   And because of Mr. Esposito's past propensity to breach his

---

conference prior to the evidentiary hearing, and as Matthews represents in its post-hearing brief, an index of documents stored on Mr. Esposito's hard drive was produced to Matthews only ***after*** the period for the preliminary-injunction discovery had closed, and after Matthews submitted its pre-hearing briefs. *See* ECF 148, pp. 3-4.   While Matthews requests an adverse inference as to these documents, the Court finds no adverse inference is necessary at this time, as the Court is ruling in Matthews's favor on its breach-of-contract claim against Mr. Esposito.

agreements—particularly his taking, uploading, and using of Matthews's confidential information for Implant—the Court does not find that the standstill agreements provide Matthews adequate relief as to Mr. Esposito.

Second, the Court finds that it presently cannot adequately quantify the pecuniary value of Mr. Esposito's breaches.

The Court therefore concludes that Matthews has sufficiently shown irreparable harm as to its breach-of-contract claim against Mr. Esposito.

### 3.    Balance of harm and public interest.

Finally, the Court finds that Matthews satisfies the final two elements for a preliminary injunction.

As to the balance of harm, Mr. Esposito will not be prevented from working for Implant.  Rather, he simply won't be able to compete with Matthews in providing cremation services.  But this doesn't prevent him from working in Implant's recycling business or Implant's servicing of processors.  *See* ECF 148-1, p. 4.  And neither does this prevent Mr. Esposito from working as a sales executive in another industry.  *See CentiMark Corp. v. Lavine*, No. 11-757, 2011 WL 3209106, at *5 (W.D. Pa. July 28, 2011) (Schwab, J.) ("[A] preliminary injunction would not prevent [Defendant] from working.  He could work for Great Lakes or another roofing firm outside the Detroit market, or in sales in a different industry in Detroit.").

Thus, the harm to Mr. Esposito does not outweigh the harm Matthews would face—such as the loss of goodwill, customers, and employees—by Mr. Esposito's continued breaches.  This is especially so considering that Mr. Esposito inflicted any hardship upon himself, by choosing to solicit Mr. Brown and choosing to use Matthews's documents and upload them to Implant's server.  *See HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172-73 (3d Cir. 2015) ("[Defendant] left [Plaintiff] and joined CarePoint knowing that he was subject to a non-compete

agreement that [Plaintiff] refused to waive. Hence, to the extent this placement has caused 'hardship,' he brought any hardship upon himself." (cleaned up)).

As to the public interest, the Court finds no reason to conclude that the public would be harmed by enforcing Mr. Esposito's restrictive covenants.

Therefore, the Court finds that Matthews is entitled to additional preliminary-injunctive relief as to its breach-of-contract claim against Mr. Esposito. The Court will enforce Mr. Esposito's non-solicitation and non-compete obligations for a two-year period, subject to Matthews posting a bond in the amount of $850,000.[15]

## III. Matthews is not entitled to any injunctive relief broader than the relief provided by Defendants' standstill and remediation agreements and the relief granted on the breach-of-contract claim against Mr. Esposito.

"Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *City of Phila. v. Attorney General of U.S.*, 916 F.3d 276, 292 (3d Cir. 2019) (cleaned up). Because injunctive relief must be closely tailored to the harms it addresses, "the preliminary injunction must protect

---

[15] Mr. Esposito credibly testified that he "earned between $400,000 and $450,000 from Implant" per year in 2019 and 2020. ECF 132, p. 151:13-18. The Court thus finds that an $850,000 bond is appropriate here. *See Howmedica Osteonics v. Zimmer Inc.*, 461 F. App'x 192, 198 (3d Cir. 2012) ("The amount of the bond is left to the district court's discretion." (citation omitted)); *see also* Fed. R. Civ. P. 65(c). Absent the Court enforcing Mr. Esposito's restrictive covenants, it can reasonably be assumed that Mr. Esposito would earn—and thus, stands to possibly lose by this injunction—about $425,000 from Implant each of the next two years. Because the Court is enforcing the restrictive covenants for two years, the Court calculates the bond by multiplying this expected-yearly salary by two. *See, e.g.*, *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 447-48 (E.D. Pa. 2017) (calculating the bond based on the established base salary of the enjoined party); *see also GlaxoSmithKline LLC v. Boehringer Ingelheim Pharm., Inc.*, -- F. Supp. 3d --, 2020 WL 5258317, at *14 (E.D. Pa. Sept. 3, 2020) ("When setting the amount of security, district courts should err on the high side because the movant still has to prove its loss to receive the bond while an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." (cleaned up)).

a plaintiff from the cause of irreparable harm and nothing more." *I.M. Wilson, Inc.*
*v. Grichko*, No. 18-5194, 2019 WL 5394113, at *4 (E.D. Pa. Oct. 22, 2019).

As already discussed, except as to Mr. Esposito, the Court concludes that the
standstill agreement and remediation agreement—and Defendants' continued
compliance with them—provide adequate preliminary-injunctive relief to Matthews.
The agreements provide that Defendants will return all of Matthews's information,
will not use the information, and will remediate the Implant and IR systems to ensure
all Matthews information is returned.  Defendants also will not service or support, in
a manner that competes with Matthews, any current customer of Matthews that uses
a Matthews cremator.

Matthews is not entitled, however, to a preliminary injunction preventing
Defendants (other than Mr. Esposito) from servicing, or competing for, Matthews's
former or prospective customers.  Aside from Mr. Esposito, Matthews has not shown
that the Court must preliminarily enjoin any of the Defendants to refrain from such
activities, whether that's because there's no enforceable restrictive covenant, there's
no evidence of such a breach, the restrictive period has ended, or there's no
irreparable harm.  And because Defendants are returning, and not using, Matthews's
information, any potentially unfair harm to Matthews is greatly diminished.

Further, Matthews's breach-of-contract claims do not otherwise entitle
Matthews to any additional preliminary-injunctive relief, except for Mr. Esposito, as
discussed above.

Because the extent of Matthews's irreparable harm is thus remedied by
Defendants' agreements and by the Court's order regarding Mr. Esposito, no further
preliminary-injunctive relief is appropriate.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court grants in part and denies in part
Matthews's motion for a preliminary injunction.  ECF 4.  The preliminary injunction

against Mr. Esposito is subject to Matthews posting a bond in the amount of $850,000; and the remaining preliminary-injunctive relief as to all of the Defendants is subject to Matthews posting a nominal bond in the amount of $100.  An appropriate order follows.

DATE: February 25, 2021                    BY THE COURT:

                                           /s/ J. Nicholas Ranjan
                                           United States District Judge

- 34 -